**Not yet scheduled for oral argument**
**No. 24-5201**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Susan Qashu,

Plaintiff-Appellant,

v.

Antony J. Blinken,

Defendant-Appellee.

---

On Appeal from a Final Judgment of the
United States District Court for the District of Columbia
Case No. 1:22-cv-01077, Judge Trevor N. McFadden

---

**OPENING BRIEF FOR PLAINTIFF-APPELLANT SUSAN QASHU**

---

Joanna Wasik
WASHINGTON LAWYERS COMMITTEE FOR
  CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
(202) 319-1069

Jonathan Corn
Morgan F. Flitt
Matt Grabianski
  Student Counsel

Regina Wang
Brian Wolfman
Becca Steinberg
GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC
600 New Jersey Ave. NW,
  Suite 312
Washington, D.C. 20001
(202) 661-6741

Counsel for Appellant Susan Qashu

December 3, 2024

## Certificate as to Parties, Rulings, and Related Cases

**Parties.** The parties on appeal are Plaintiff-Appellant Susan Qashu and Defendant-Appellee Antony J. Blinken, in his official capacity as Secretary of the Department of State.

**Rulings under review.** The district court's memorandum opinion granting summary judgment to Blinken is under review. *See Qashu v. Blinken*, 2024 WL 3521592 (D.D.C. July 24, 2024).

**Related cases.** This case has not previously been before this Court, and no related cases of which counsel is aware are pending before this Court.

/s/ Regina Wang

Regina Wang

Counsel for Plaintiff-Appellant

**Table of Contents**

Certificate as to Parties, Rulings, and Related Cases........................................ ii

Table of Authorities .................................................................................... v

Glossary ....................................................................................................x

Jurisdiction .................................................................................................1

Issues Presented ......................................................................................1

Statement of the Case ................................................................................2

I.    Factual background.................................................................................2

    A.    Qashu is disabled and was qualified for her job at State....................2

    B.    Qashu made accommodation requests, but State's response did not adequately address Qashu's on-the-job, disability-related challenges...................................................................................4

    C.    State targeted and bullied Qashu. .......................................................8

    D.    State offered, but then denied Qashu the second year of her fellowship..............................................................................10

    E.    State changed Qashu's ocean-acidification duties. ...........................14

II.    Procedural background.................................................................17

Summary of Argument ...............................................................................19

Standard of Review.....................................................................................21

Argument ....................................................................................................21

I.    Qashu established disparate-treatment disability-discrimination claims. .................................................................................................22

    A.    Qashu established that State's discriminatory conduct is actionable under the Rehabilitation Act...........................................22

        1.    State does not dispute that Qashu's fellowship nonrenewal qualifies as an actionable discharge. ...........................22

        2.    State altered the terms, conditions, and privileges of Qashu's employment when it denied her a leadership position...........................................................................23

     3.     State altered the terms, conditions, or privileges of Qashu's employment when it restricted her job responsibilities. ...................................................................25

  B.    A reasonable jury could conclude that State discriminated against Qashu because of her disability. ............................................27

     1.     A reasonable jury could believe that State's explanations for Qashu's fellowship nonrenewal are pretextual. ......................28

     2.     A reasonable jury could believe that State's explanation for denying Qashu leadership of the ocean-acidification work is pretextual. ..................................................................36

     3.     State did not attempt to explain why it restricted Qashu's responsibilities to assisting a less-qualified employee. ..............40

II.   State failed to accommodate Qashu. .......................................................42

  A.    State denied Qashu's requests for reasonable accommodations by failing to engage in good faith in the interactive process. .........42

     1.     State was aware of Qashu's need for accommodations but did not work collaboratively with her to provide reasonable accommodations. ........................................................43

     2.     State unreasonably delayed providing Qashu with accommodations. ..........................................................49

III.  Qashu established retaliation claims under the Rehabilitation Act. ......51

  A.    State took three materially adverse actions against Qashu. .............52

  B.    A reasonable jury could believe that Qashu's protected activities caused the adverse actions. .................................................53

Conclusion .................................................................................................54

Certificate of Compliance .........................................................................

Certificate of Service ................................................................................

## Table of Authorities

**Cases**                                                                          **Page(s)**

*Adams v. Rice,*
　531 F.3d 936 (D.C. Cir. 2008)...............................................................21

*Aka v. Wash. Hosp. Ctr.,*
　156 F.3d 1284 (D.C. Cir. 1998) (en banc) ........................................27, 33, 38

*Ali v. Regan,*
　111 F.4th 1264 (D.C. Cir. 2024) ........................................................21, 42, 43

*Ash v. Tyson Foods, Inc.,*
　546 U.S. 454 (2006)...............................................................................37

*Barth v. Gelb,*
　2 F.3d 1180 (D.C. Cir. 1993)...............................................................21

*Brady v. Off. of Sergeant at Arms,*
　520 F.3d 490 (D.C. Cir. 2008)...........................................................27, 28

*Burlington N. & Santa Fe Ry. Co. v. White,*
　548 U.S. 53 (2006).............................................................................52, 53

*Chambers v. District of Columbia,*
　35 F.4th 870 (D.C. Cir. 2022) (en banc) .......................................23, 24, 25, 26

*City of L.A., Dep't of Water & Power v. Manhart,*
　435 U.S. 702 (1978)...............................................................................23

*Cruz v. McAleenan,*
　931 F.3d 1186 (D.C. Cir. 2019)...........................................................31

*Czekalski v. Peters,*
　475 F.3d 360 (D.C. Cir. 2007)...........................................................31, 36

*DeJesus v. WP Co.,*
　841 F.3d 527 (D.C. Cir. 2016)...........................................................32, 33

*Domínguez–Cruz v. Suttle Caribe, Inc.,*
 202 F.3d 424 (1st Cir. 2000) ..................................................................29

*Elzeneiny v. District of Columbia,*
 125 F. Supp. 3d 18 (D.D.C. 2015)...........................................................50

*Evans v. Sebelius,*
 716 F.3d 617 (D.C. Cir. 2013)..................................................28, 34, 39

*Figueroa v. Pompeo,*
 923 F.3d 1078 (D.C. Cir. 2019)................................................27, 28, 41

*Flaherty v. Gas Rsch. Inst.,*
 31 F.3d 451 (7th Cir. 1994).....................................................................26

*Fox v. Gen. Motors Corp.,*
 247 F.3d 169 (4th Cir. 2001)...................................................................23

*Franks v. Bowman Transp. Co.,*
 424 U.S. 747 (1976).................................................................................23

*Geleta v. Gray,*
 645 F.3d 408 (D.C. Cir. 2011)................................................................29

*George v. Leavitt,*
 407 F.3d 405 (D.C. Cir. 2005)................................................27, 40, 41

*Gilbert v. Napolitano,*
 670 F.3d 258 (D.C. Cir. 2012).................................................................37

*Hamilton v. Geithner,*
 666 F.3d 1344 (D.C. Cir. 2012)..............................33, 38, 39, 52, 53

*Harris v. Grp. Health Ass'n.,*
 662 F.2d 869 (D.C. Cir. 1981).................................................................33

*Ho v. Garland,*
 106 F.4th 47 (D.C. Cir. 2024) ................................................................51

*Holcomb v. Powell*,
   433 F.3d 889 (D.C. Cir. 2006)...............................................................39

*Humphrey v. Mem'l Hosps. Ass'n*,
   239 F.3d 1128 (9th Cir. 2001)...............................................................44

*Kowitz v. Trinity Health*,
   839 F.3d 742 (8th Cir. 2016).............................................................43, 47

*Lathram v. Snow*,
   336 F.3d 1085 (D.C. Cir. 2003)........................................................38, 39

*McCray v. Wilkie*,
   966 F.3d 616 (7th Cir. 2020).........................................................49, 50, 51

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973).................................................................27, 28, 40, 41

*Meritor Sav. Bank, FSB v. Vinson*,
   477 U.S. 57 (1986)................................................................................23

*Minter v. District of Columbia*,
   809 F.3d 66 (D.C. Cir. 2015)................................................................42

*Mogenhan v. Napolitano*,
   613 F.3d 1162 (D.C. Cir. 2010).............................................................49

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024)..............................................................................26

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998)...............................................................................24

*Pantazes v. Jackson*,
   366 F. Supp. 2d 57 (D.D.C. 2005)........................................................43

*Pardo-Kronemann v. Donovan*,
   601 F.3d 599 (D.C. Cir. 2010)...................................................... 26, 52-53

vii

*Perkins v. City of New York,*
   2023 WL 370906 (2d Cir. Jan. 24, 2023) .................................................... 46-47

*Reeves v. Sanderson Plumbing Prods.,*
   530 U.S. 133 (2000) ......................................................................................39

*Singletary v. District of Columbia,*
   351 F.3d 519 (D.C. Cir. 2003) .....................................................................53

*Solomon v. Vilsack,*
   763 F.3d 1 (D.C. Cir. 2014) ........................................................................52

*Stewart v. Ashcroft,*
   352 F.3d 422 (D.C. Cir. 2003) ....................................................................52

*Stewart v. St. Elizabeths Hosp.,*
   589 F.3d 1305 (D.C. Cir. 2010) ..................................................................46

*Stoe v. Barr,*
   960 F.3d 627 (D.C. Cir. 2020) ...........................................................21, 35, 40

*Taylor v. Phoenixville Sch. Dist.,*
   184 F.3d 296 (3rd Cir. 1999) ................................................................43, 48

*Tex. Dep't of Cmty. Affs. v. Burdine,*
   450 U.S. 248 (1981) ......................................................................................27

*U.S. E.E.O.C. v. UPS Supply Chain Sols.,*
   620 F.3d 1103 (9th Cir. 2010) ...................................................44, 45, 46, 49

*Ward v. McDonald,*
   762 F.3d 24 (D.C. Cir. 2014) ....................................................42, 43, 46

*Wheeler v. Georgetown Univ. Hosp.,*
   812 F.3d 1109 (D.C. Cir. 2016) ..................................................................31

## Statutes

5 U.S.C. § 5104.................................................................................................3

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

29 U.S.C. § 791(f) ........................................................................................18, 22

29 U.S.C. § 794(a) ..............................................................................................21

42 U.S.C. § 12112(a) ...........................................................................18, 21, 22, 23

42 U.S.C. § 12112(b)(5)(A) ...........................................................................22, 43

42 U.S.C. § 12203(a) .....................................................................................21, 51

*EEOC Enforcement Guidance on Reasonable Accommodation and
Undue Hardship Under the Americans with Disabilities Act*, No.
915.002 (Oct. 17, 2002) .................................................................................44

**Other Authorities**

20 C.F.R. § 404.1581 ...........................................................................................4

29 C.F.R. § 1630.2(o)(3) ................................................................................42, 43

EEOC Compliance Manual § 613.1(a) ...............................................................25

EEOC Compliance Manual § 613.5 ....................................................................26

https://repository.arizona.edu/handle/10150/204297 .......................................3

# Glossary

| | |
|---|---|
| American Association for the Advancement of Science | AAAS |
| Americans with Disabilities Act | ADA |
| Equal Employment Opportunity | EEO |
| Equal Employment Opportunity Commission | EEOC |
| Job Access With Speech | JAWS |
| United States Department of State | State |

## Jurisdiction

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. JA 11. On July 24, 2024, the district court granted summary judgment in favor of Defendant-Appellee Antony J. Blinken, in his official capacity as Secretary of the Department of State, disposing of all of Plaintiff-Appellant Susan Qashu's claims. JA 572. Qashu timely filed her notice of appeal on September 4, 2024. JA 573. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

**I.** Whether the district court erred in granting summary judgment to the Department of State on Qashu's claims that State discriminated against her on the basis of her disability in violation of the Rehabilitation Act when it took harmful job actions against her.

**II.** Whether the district court erred in granting summary judgment to the Department of State on Qashu's claim that State failed to reasonably accommodate her disability in violation of the Rehabilitation Act.

**III.** Whether the district court erred in granting summary judgment to the Department of State on Qashu's claims that State retaliated against her in violation of the Rehabilitation Act when it took harmful job actions against Qashu after she requested reasonable accommodations and filed an EEO complaint.

## Statement of the Case

The Department of State discriminated against Dr. Susan Qashu because of her visual disability. Qashu requested accommodations to address the difficulties she faced performing her job at State because of her disability. But State did not work with her to find reasonable accommodations. Instead, it discriminated against her because of her disability. After offering Qashu a one-year renewal of her fellowship—which she accepted by signing the initial paperwork and agreeing to sign updated paperwork once changes were made—State rescinded the offer without warning. And when a role opened on Qashu's team, State passed her over and instead hired a recent college graduate who lacked any pertinent experience or a relevant degree. State then went a step further, reducing Qashu's substantive duties in a field of work in which she excelled and cared deeply about. State no longer allowed her to perform scientific work, relegating her instead to a clerical role. Throughout her fellowship, State disregarded Qashu's needs, disparaged her credentials, and ridiculed her because of her disability.

### I.    Factual background

### A.    Qashu is disabled and was qualified for her job at State.

Dr. Susan Qashu holds a Ph.D. in Arid Lands Resource Sciences from the University of Arizona, an M.S. in Marine Resource Management from Oregon State University, and a B.A. from Smith College. *See* JA 254 (¶ 1), 241 (¶ 38), 533. At the University of Arizona, Qashu's research concerned how households in an arid coastal zone could adapt to social and environmental

pressures in a national marine reserve.[1] Before she started at State, Qashu had always received extensive praise for her job performance. JA 254 (¶ 3). In February 2016, she began a fellowship through a program coordinated by the American Association for the Advancement of Science (AAAS) that matches scientists with government agencies. JA 42-45, 56-57. Qashu was placed in State's Office of Ocean and Polar Affairs for a one-year position that was renewable for a second year with the approval of both AAAS and State. JA 42-57.

Early in her fellowship at State, Qashu was assigned to work on ocean-acidification issues, an area in which she spent a "considerable amount of her time." JA 524. Dr. Luis Estevez Salmeron, another AAAS fellow in a different State office, led the two-person ocean-acidification team, and Qashu "contribut[ed] her expertise and support as appropriate." JA 201 (¶ 56), 290-91. Qashu was a GS-12 while employed at State, reflecting her considerable skills and experience. JA 26, 280.[2]

Qashu has Leber's Hereditary Optic Neuropathy, a rare disability that causes a loss of central vision (which controls detail-based vision and reading) and a reduced perception of color. *See* JA 254 (¶ 4), 266 (¶ 34), 271 (¶ 6). Since 1985, she has been medically determined to be legally blind. JA

---

[1] https://repository.arizona.edu/handle/10150/204297.

[2] The GS classification and pay system ranges from GS-1 (lowest) to GS-15 (highest), reflecting increasing levels of job difficulty, responsibility, and qualifications. *See* 5 U.S.C. § 5104.

254 (¶ 4); *see* 266 (¶ 35); 20 C.F.R. § 404.1581. Without proper accommodations, Qashu typically cannot read anything smaller than size-24 bold-faced font or view images with low contrast, including gray-on-gray, green-on-darker-green, or gray-on-green digital screens. *See* JA 271-72 (¶¶ 5-6), 266 (¶ 35). She cannot make out the identity of individuals who are more than an "arm's length" away. *See* JA 266 (¶ 35).

**B.    Qashu made accommodation requests, but State's response did not adequately address Qashu's on-the-job, disability-related challenges.**

Because of her disability, Qashu cannot read most formatted printed or electronic documents and cannot navigate a computer's interface, including inputting log-in information and reading emails, among other challenges. *See* JA 306, 289. Qashu could perform all the functions of her job at State but required accommodations to complete certain key functions like drafting and reviewing emails, researching, reviewing, and drafting documents and spreadsheets, using office equipment, learning about meetings, and completing trainings. *See* JA 271-72 (¶ 7), 289, 307, 310.

Therefore, months before her fellowship started in February 2016, Qashu notified State's Disability and Reasonable Accommodation Division, as well as her supervisors, Office of Ocean and Polar Affairs Deputy Director William Sohier and Director Evan Bloom, of her disability and discussed her request for accommodations. JA 174-77, 183-85. These accommodations included a Ruby handheld magnifier and a laptop installed with two

software programs: Zoomtext and Job Access With Speech (commonly referred to as "JAWS"). *See* JA 174-84. Qashu needed Zoomtext and JAWS to enlarge text or have on-screen text read to her out loud in a computer-generated voice. JA 174-77, 306-07. She needed the Ruby handheld magnifier to enlarge and change the color contrast of certain text. JA 333, 308. Right after she started in February 2016, Qashu also received noise-cancelling headphones, JA 189, which allowed her to listen to JAWS, JA 273 ¶ 19.

After starting the job, Qashu requested additional accommodations because what was offered was not enough for her to adequately perform her job. For example, her handheld Ruby magnifier did not enable her to properly see the color contrast on shared office equipment, such as the office printer and photocopier. *See* JA 273 (¶ 17). That equipment had low contrast or gray-on-gray, green-on-darker green, or gray-on-green digital screens, *see* JA 273 (¶ 16), 289, so, even with her magnifier, all she saw was blurry text, *see* JA 273 (¶ 17). Qashu therefore needed an additional accommodation to use this shared office equipment.

Sohier and Bloom knew that Qashu may have needed to use the office equipment but did not consider how they might make the office equipment accessible, *see* JA 373, 393, by, for instance, changing the color contrast of the digital screens. Instead of figuring out an appropriate accommodation, Sohier refused to talk to State's Disability and Reasonable Accommodation Division about making the printer accessible to Qashu. JA 255 (¶¶ 6-7).

Because State gave Qashu an office next to noisy office equipment and socializing colleagues, she needed a quieter office space to properly use her headphones to hear the voice coming from her JAWS software. *See* JA 273-74 (¶¶ 21-23), 266-67 (¶ 37). Qashu therefore repeatedly requested a quieter office in March, April, and October 2016. JA 288. State had at least four empty offices that could accommodate this request, *see* JA 266-67 (¶ 37), 288, but it did not move Qashu to a quieter office until October, seven months after her first request, *see* JA 266-67 (¶ 37), 274 (¶ 23).

Qashu also realized she needed an alternative way to be notified of meetings because her electronic meeting notices and reminders were not accessible with Zoomtext and JAWS. *See* JA 273 (¶ 14). She therefore sought alternative meeting-notification accommodations. *See* JA 289. Qashu informed Bloom when she had trouble attending a meeting because of these difficulties. *See* JA 273 (¶ 20), 389. Sohier also knew that Bloom was upset about Qashu missing meetings but did not do anything to assist Qashu in attending and finding meetings. *See* JA 364-70. Nobody was assigned to let Qashu know when meetings were happening. JA 368. Instead, Sohier expected Qashu to learn about meetings by noticing other people going to them. JA 364-68. But Qashu could not simply observe her colleagues going to meetings because of her visual impairment and because she often had on the noise-cancelling headphones State had provided so that she could listen to her JAWS voice-assistive software. *See* JA 273 (¶¶ 18-19), 296, 189.

State also did not check if Qashu's computer could run Zoomtext and JAWS properly, *see* JA 322, 327, 329, 331, even though it is known in the disability-accommodations industry that Zoomtext and JAWS can cause "significant functionality problems" if installed on computers with inadequate hardware, *see* JA 307-08. Nor was State ever aware of whether Zoomtext and JAWS were enabled to function with Qashu's computer login. *See* JA 327. For the first four months of the job, Qashu's computer could not handle Zoomtext and JAWS, causing it to freeze and crash about five times a day. *See* JA 272 (¶ 8), 310.

When her JAWS software failed, Qashu requested assistance from employees known as "readers," staff in State's Disability and Reasonable Accommodation Division who could help her read her computer text. *See* JA 260 (¶ 17), 486, 463-66. She also needed readers to help her complete several of State's required training courses on its inaccessible Foreign Service Institute platform. JA 309. State knew that the trainings were incompatible with Qashu's software but did not have on-call readers to assist her. *See* JA 260 (¶ 17), 309, 486-87. Instead, a limited number of readers served all of State, and a request for a reader could take weeks, depending on availability. *See* JA 260 (¶ 17), 334-35.

Without these accommodations, Qashu struggled to perform her job. When Zoomtext and JAWS didn't work, Qashu couldn't send and read emails or review and draft documents, eliciting criticism and anger from her supervisors and colleagues. *See* JA 272-73 (¶¶ 12-13). Her unstable computer

and lack of alternative meeting notifications also caused Qashu to miss or arrive late to meetings. *See* JA 289, 272 (¶ 12).

State replaced Qashu's computer after at least four months of computer dysfunction. JA 272 (¶¶ 8-9). But Qashu still experienced the same computer instability until her computer was finally fixed with a working fan—nine months into her twelve-month fellowship. *See* JA 272 (¶ 9), 463-66. For the entire nine months without a functional computer, Qashu could not attach documents to emails, see and use Zoomtext or JAWS on her login portal, listen to JAWS, or consistently read the font on her computer. *See* JA 272 (¶¶ 10-11), 260 (¶ 17), 516. In addition to this computer dysfunction, Qashu could not see and use the shared office equipment to print, photocopy, or fax documents to complete required job duties. *See* JA 255 (¶ 8), 259-60 (¶¶ 16-17), 289. Because her noisy office interfered with her ability to hear her JAWS assistive software, she sometimes had to stay at the office until 10:00 p.m.— after everyone else had left—to finish listening to documents. *See* JA 266-67 (¶ 37). And because State did not have readers available to help Qashu complete required trainings on its inaccessible platform, Qashu needed an extension of time to complete the trainings. *See* JA 463-64.

### C.   State targeted and bullied Qashu.

As Qashu sought accommodations, she faced ridicule and bullying from her supervisors. In February 2016, Crystal Maitland, an employee from State's Disability and Reasonable Accommodation Division, was helping

Qashu install printing software on her computer, and they both asked an intern for help. JA 255 (¶ 7). Deputy Director Sohier saw them and, in "an intimidating manner," said "[d]on't you two see that people have better things to do and have work to do?" *Id.* Maitland reported Sohier's conduct to his bosses. JA 256 (¶ 9). After Sohier found out about the complaint, he denied several of Qashu's requests to attend training programs and travel for her work. *Id.* One of these denied trainings taught basic office information and procedures, including the organization of State's office buildings. JA 286-88. Without this training, Qashu often got "lost in hallways." JA 287.

The hostility did not stop. Sohier screamed at Qashu in front of another employee. JA 255 (¶ 7). After Sohier was reprimanded by his superiors for his disrespectful behavior toward Qashu and a reader, he began making derogatory pelvic gestures whenever Qashu entered his office. JA 61, 71, 72, 261 (¶ 19). Qashu felt that Sohier was "trying to make [her] feel uncomfortable" and that the behavior was "harassment/discrimination." JA 71-72. Qashu tried to discuss this serious misconduct with Director Bloom but Bloom "only wanted to talk about policy … not about office issues." JA 261 (¶ 19). Beyond this dismissive response, Bloom, too, was hostile. Whenever Qashu entered Bloom's office, he immediately turned his back to Qashu, no matter which direction he was facing when she entered. JA 260 (¶ 18).

Other employees noticed State's animosity towards Qashu. *See* JA 300. Alicia Cahoon, a State employee during Qashu's tenure, observed that Qashu's managers "seemed to resent" that Cahoon and other readers came to assist Qashu and "seemed to regard reasonable accommodation for her as an imposition." JA 300 (¶ 6). Based on conversations within State's Disability and Reasonable Accommodation Division, Cahoon thought that "management did not want [Qashu] around." JA 300 (¶ 5).

Despite these challenges, Qashu received high ratings in her annual performance review, and both Sohier and Bloom expressed a willingness to renew her fellowship for its second year. JA 520-21, 377, 396.

### D. State offered, but then denied Qashu the second year of her fellowship.

On June 3, 2016, Qashu received an offer letter extending her fellowship for a second year. JA 483. The letter stated that, to accept the offer, Qashu needed to return the renewal paperwork to AAAS within "one week of receipt of this letter." *Id*.

Shortly after, Qashu met with AAAS Program Managers Rick Kempinski and Chitra Kalyandurg to discuss the paperwork. JA 454, 61. Qashu brought a signed copy of the paperwork to that meeting, indicating her intent to accept the offer. JA 62.

Qashu also wished to discuss some changes to the fellowship renewal paperwork. JA 61. For example, the paperwork contained material inaccuracies, including a wrong end date. JA 60. She was also concerned that

10

the paperwork identified Sohier as her assigned "mentor," which was inaccurate. *Id.* Sohier was her supervisor, *id.*, while a fellowship "mentor" provides general guidance, answers questions, and gives input to fellows, JA 408-09. Qashu also discussed changing offices or supervisors because Sohier was hostile to her and engaged in inappropriate behavior, including the previously described pelvic thrusting that made her uncomfortable. JA 61-62. Kempinski and Kalyandurg told Qashu to hold on to her signed paperwork as they worked on changing her supervisor. JA 62. They also said she could wait to submit her paperwork, without specifying a deadline, because they were going to address the issues she mentioned. *Id.*

On June 7, Qashu emailed Kempinski and Kalyandurg, indicating that she would be out of the office until June 15 and offering twice to sign any paperwork they needed before she left. JA 449-50. Qashu also mentioned that she renewed her AAAS membership. JA 449. On June 8, Kempinski replied, asking Qashu to "bear with" them until they could clarify her "situation." *Id.* Kempinski added that, "[a]t this point, we can wait to receive documentation at a later time and certainly can hold off until you return to the office next week." *Id.*

On June 9, State Fellowship Coordinator Genya Dana emailed Qashu to ask if there was a good time for them to chat so she could better understand Qashu's "concerns" about her renewal offer. JA 229-30. About once a week over the next month, Qashu emailed, called, and left messages for AAAS. JA 64. She also called Dana and her colleague, Dr. Frances Colon. *Id.* Qashu said

11

that these contacts were efforts to discuss her request for a change of supervisor, the possible office change, and the previously discussed inaccuracies in her paperwork. JA 64-65. On July 7, Qashu emailed Dana, offering to meet in person to explain her concerns with the paperwork. JA 229-30. On July 12, Dana replied and apologized for her delay. JA 229. Dana confirmed that AAAS was happy to list Sohier as a "point of contact" instead of a mentor and asked Qashu if she was okay with this change. *Id.*

But no one at State or AAAS ever sent Qashu corrected, accurate paperwork. Instead, just three days later, on July 15, AAAS drafted a nonrenewal letter that it sent to Qashu on July 19. JA 452, 231. The letter said:

> In collaboration with the U.S. Department of State, the American Association for the Advancement of Science (AAAS) has made the determination that a renewal fellowship year is no longer an option.

> The deadline to submit signed renewal paperwork passed more than a month ago. Discussions with you and the host office indicate that the match of your skills and interests to the focus and needs of the office is not aligned to result in a mutually beneficial renewal year. The request to change offices and mentors is not approved.

> I regret that this is not the outcome you were hoping for. Renewals are approved to move forward when there is mutual agreement and support from the host agency and office, AAAS, and the fellow. There is a three-way agreement that this placement is not a good fit.

JA 231.

12

Qashu was stunned. *See* JA 79. As she later explained to State, although the letter indicated that the nonrenewal was the product of a "three-way agreement," AAAS and State made this decision without involving Qashu. JA 454. She had received an extension of the renewal paperwork deadline without an explicit end date, and, at multiple points, she offered to come in and sign updated paperwork. *See* JA 449-50. Neither State nor AAAS gave any warning that the extension was about to end. *See* JA 274 (¶ 24).

On July 22, Qashu met with Dana and Kempinski and asked how her performance was reviewed so she could understand if her performance had influenced her termination. JA 68-69. They refused to explain, instead noting that someone had complained to Sohier and Bloom about Qashu. JA 69. Dana was "very harsh" throughout the meeting and told Qashu that she had asked for too much, too early on. *See* JA 69, 67. Qashu was unsure what that comment encompassed, but she thought Dana was at least referring to Qashu's requests for training programs and travel related to work, which Sohier dismissively rejected on multiple occasions. JA 67-69, 256 (¶¶ 9-10). Dana added another vague, purported reason for Qashu's nonrenewal: that Qashu had travel and other opportunities taken away from her. JA 68.

On July 26, Qashu emailed Dana, Kempinski, and AAAS Director Cynthia Robinson, attaching the paperwork she initially signed and brought with her to the June meeting with Kempinski. JA 455. Qashu offered the paperwork to show that she had signed it on time. *Id.* The next day, Robinson responded that "there is no longer a sufficient match to support a second fellowship

year," adding that Qashu's paperwork was insufficient because "each page of the letter required initials, and all pages were to be submitted by the deadline along with the signed and initialed Terms of Agreement document." JA 454-55. Robinson also clarified that it was AAAS and State that had determined there was not, in fact, a "three-way agreement," and that they regretted that this came as a surprise to Qashu. JA 454.

That day, Qashu forwarded her correspondence with Robinson to two State employees, asking them to discuss the decision with her. JA 454. Qashu expressed her disappointment and concern over the nonrenewal, explaining that she had completed the paperwork on time and that she "tried to work within [the] fellowship system and it backfired." *Id.* The record does not contain a response to this email.

On August 1, Qashu filed an internal EEO complaint with State's Office of Civil Rights concerning her fellowship nonrenewal. JA 457-61. The complaint alleged she was discriminated against based on her disability when she was subjected to a hostile work environment and when her fellowship was not renewed. JA 458. Bloom and Sohier filed affidavits in response later that month. JA 285.

### E.    State changed Qashu's ocean-acidification duties.

From April to October 2016, Qashu successfully handled a broad array of responsibilities for the ocean-acidification team. *See* JA 524, 257 (¶ 13). Among other things, Qashu helped solicit and select ocean-acidification

14

projects, provided technical advice to those projects, and developed a toolkit that helped monitor global ocean acidification. JA 524. She also coordinated with other offices within State, State's embassy in Finland, the Natural Resources Defense Council, the National Oceanic and Atmospheric Administration, and the Ocean Conservancy to organize a successful workshop in Finland. *Id.* Outside of her intensive ocean-acidification work, she represented the United States as a science advisor at the United Nations' World Ocean Assessment conference. *Id.*

Voltmer later rated Qashu's work on ocean acidification as "[e]xceeds [e]xpectations" in her performance review. JA 520-21. She also agreed that Qashu could represent State at another conference, the Governor's Ocean Acidification workshop. JA 291.

Qashu loved her ocean-acidification work, which aligned with her "area of specialization" in marine and natural resources. *See* JA 254 (¶ 2), 261 (¶ 20). Her role on the acidification team was one of the principal reasons Qashu wanted to continue working at State. *See* JA 261 (¶ 20), 65.

Qashu and Salmeron worked together on ocean-acidification projects until September 22, 2016, when they jointly met with Voltmer because Salmeron was leaving State. JA 290-91, 201 (¶ 56). During that meeting, Salmeron praised Qashu's work on the ocean-acidification team and recommended that she continue the work because she created positive results. JA 290-91. Voltmer indicated that she supported Qashu's continued primary role on the portfolio and planned to run that arrangement by Bloom.

15

*See id.* One year later, however, in response to EEO questioning, Voltmer claimed that neither Salmeron nor Qashu had explicitly recommended giving Qashu leadership of the portfolio. JA 201 (¶ 56).

State subsequently assigned a new employee, E. Boeck, to manage the ocean-acidification portfolio. JA 201 (¶ 56), 203-04. A recent college graduate, Boeck had majored in Middle Eastern Studies and minored in Environmental Policy. *See* JA 203-04. Voltmer claimed that Bloom made the decision to assign the role to Boeck, JA 201 (¶ 56), but Bloom did not remember making any portfolio-related decision, *see* JA 118. State's Rule 30(b)(6) deponent, Allison Schwier, later explained that Boeck was chosen after "leadership of that office made determinations based on work levels and other things as relevant." JA 216.

Around October 25, 2016, Voltmer called Qashu, Salmeron, and Boeck into a meeting about the ocean-acidification portfolio. JA 291. Voltmer "stated that [Qashu] would be staffing [Boeck]" and that Boeck would be the exclusive point of contact for the team. JA 79. Voltmer told Qashu that she could no longer represent State at the Governor's Ocean Acidification workshop with interagency partners Qashu had worked with for eight months. JA 291. Despite Qashu's relevant experience and skills, "only Boeck, as [p]oint of [c]ontact, could attend" and Qashu's attendance was no longer "'mission critical' travel." JA 291, 201 (¶ 56).

In the same meeting, Voltmer told Qashu that, in contrast to her earlier ocean-acidification work, Qashu's role was now "only to staff and provide

16

clerical support to [Boeck]," and to "assist" and "advise" Boeck. JA 79, 257 (¶ 12), 280. So, Qashu "was no longer allowed to speak … to the colleagues … that [she] had worked with for seven months" and "no longer worked on [ocean-acidification] duties after the meeting." JA 256-57 (¶¶ 11-12).

Qashu's superiors never explained the reasons for this role reassignment. JA 280-81, 285. The reassignment devastated Qashu, who later recalled, "I had gone running out of the meeting and excused myself because I had to cry. I was crying in the hallway. I was crying in the office. I was really upset." JA 81.

Qashu's last day with State was February 3, 2017. JA 197-98. On that day, Voltmer snidely remarked to Qashu, "[y]ou struggle even with your equipment." JA 264 (¶ 29). Qashu has not had stable, long-term employment since then. JA 262 (¶ 23), 295-96.

## II.     Procedural background

Qashu brought her case to the EEO Counselor at State in August 2016. JA 12 (¶ 13); ECF 20 (¶ 13). She later filed a hearing request with the EEOC, ECF 1 at 34, which issued a final decision in January 2022, JA 12 (¶¶ 14-15); ECF 20 (¶¶ 14-15). In April 2022, Qashu sued State under the Rehabilitation Act, alleging that State discriminated against her because of her disability by not renewing her fellowship for a second year, by effectively demoting her, by failing to reasonably accommodate her, and by retaliating against her for both requesting accommodations and filing an EEO complaint. JA 26-30 (¶¶

107-125). The district court granted summary judgment to State on all claims. JA 571.[3]

The court held that Qashu could not show that State discriminated against her because neither State's appointment of Boeck to manage ocean-acidification work nor State's reassignment of Qashu to clerical assistance altered the "terms, conditions, or privileges" of Qashu's employment. JA 558-62 (quoting 42 U.S.C. § 12112(a), as incorporated by 29 U.S.C. § 791(f)). The court then held that even if Qashu alleged a "cognizable adverse action" under the Rehabilitation Act, that action "resulted from her own voluntary conduct in declining to volunteer to take on the ocean acidification work." JA 560. It went on to hold that Qashu's fellowship nonrenewal was not discriminatory because State was not involved in the nonrenewal decision, and its proffered reasons were not pretextual. JA 562-65.

The district court also held that State accommodated Qashu's disability because it made good-faith efforts to give her "most of" what she requested and any delay in accommodating Qashu was not unreasonable. JA 566-69. The court determined that because Qashu continued to use a computer incompatible with Zoomtext and JAWS, any resulting technology issues were "invited by Qashu herself." JA 567-68.

---

[3] In addition to Antony J. Blinken, Qashu originally named Evan Bloom, Dave Sohier, Chever Voltmer, Genya Dana, Frances Colon, and the Department of State as defendants. ECF 1. These additional defendants were not named in the operative First Amended Complaint. ECF 18, ECF 44. Only the claims against Antony J. Blinken in his official capacity remain.

The district court also held that Qashu did not state a retaliation claim related to either her nonrenewal or her effective demotion, for largely the same reasons it dismissed the discrimination claims: the nonrenewal of Qashu's fellowship was nondiscriminatory and her effective demotion was not an adverse action under the Rehabilitation Act. *See* JA 570-71.

## Summary of Argument

### I. Discrimination

**A.** State discriminated against Qashu with respect to the terms, conditions, and privileges of her employment by not renewing her fellowship, failing to promote her, and restricting her job responsibilities. State's decisions to promote Boeck over Qashu and to relegate Qashu to clerical assistance adversely affected the terms, conditions, or privileges of her employment at State. By failing to place Qashu in an open managerial role, State impeded her career development. And by demoting Qashu—a Ph.D. scientist—to a clerical role, State drastically changed her day-to-day employment conditions.

**B.** A reasonable jury could find that State took these employment actions because of Qashu's disability. Considering State's shifting and false explanations for the nonrenewal, its inappropriate use of subjective considerations, its refusal to take responsibility for the nonrenewal, and the discriminatory statements by colleagues and decisionmakers who work

19

with Qashu, a reasonable jury could find that State's proffered reasons for the employment actions are pretextual.

State's explanation for denying Qashu leadership of the ocean-acidification work—that Qashu never volunteered for the role—is also pretextual. The large gap in qualifications between Qashu and Boeck, paired with other flaws in State's proffered explanation, could allow a reasonable jury to conclude that Qashu was discriminated against based on her disability. A jury could similarly find that State restricted Qashu's responsibilities to staffing and assisting Boeck for discriminatory reasons, especially because State has failed to offer a nondiscriminatory reason.

## II. Failure to reasonably accommodate

State failed to reasonably accommodate Qashu's disability. State was on notice that Qashu had significant difficulties performing the key functions of the job without reasonable accommodations for her disability, so it had a duty to engage in an interactive process to find reasonable accommodations. State did not meet that obligation because it (1) failed to engage in a collaborative exchange of information to find reasonable accommodations to address her challenges, and (2) unreasonably delayed providing some of Qashu's key accommodations.

## III. Retaliation

State retaliated against Qashu in violation of the Rehabilitation Act. First, Qashu engaged in protected activities by requesting reasonable accommodations and by filing an EEO complaint. Second, she experienced

materially adverse employment actions: her fellowship was not renewed, and her ocean-acidification work was reassigned. Both actions could have dissuaded a reasonable employee from claiming discrimination. As with her discrimination claims, the reasons State gave for these adverse actions are pretextual.

## Standard of Review

The district court's grant of summary judgment is reviewed de novo, with this Court viewing all evidence in the light most favorable to the nonmoving party, Qashu, and drawing all reasonable inferences in her favor. *Ali v. Regan*, 111 F.4th 1264, 1273 (D.C. Cir. 2024). The Court's role is not to "determine the truth of the matter but to determine whether there is a genuine issue for trial." *Stoe v. Barr*, 960 F.3d 627, 638 (D.C. Cir. 2020).

## Argument

The Rehabilitation Act prohibits discrimination against a qualified individual with a disability by a federal employer and requires the employer to take reasonable affirmative steps to accommodate people with disabilities. 29 U.S.C. § 794(a); *see Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). The Rehabilitation Act "instructs courts to use the same standards" used under the Americans with Disabilities Act. *Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008). Employers can therefore be held liable for both discriminating and retaliating against qualified individuals with disabilities. *See* 42 U.S.C. §§ 12112(a), 12203(a). The obligation not to discriminate includes a duty to

21

make reasonable workplace accommodations for individuals with disabilities. 42 U.S.C. § 12112(b)(5)(A).

## I. Qashu established disparate-treatment disability-discrimination claims.

An employer may not "discriminate against a qualified individual [with a disability] in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see* 29 U.S.C. § 791(f). The district court erred in concluding that State cannot be held liable for Qashu's nonrenewal and that the changes to her job assignments were unrelated to the terms, conditions, and privileges of her employment. This Court should reverse and remand for a jury to determine whether State took these actions because of Qashu's disability.

### A. Qashu established that State's discriminatory conduct is actionable under the Rehabilitation Act.

#### 1. State does not dispute that Qashu's fellowship nonrenewal qualifies as an actionable discharge.

State maintains that Qashu's fellowship nonrenewal was not discriminatory. A nonrenewal qualifies as an actionable discharge under the Rehabilitation Act. 42 U.S.C. § 12112(a); *see also* 29 U.S.C. § 791(f); ECF 33 at 20-22. The district court nonetheless said that Qashu "did not adduce any evidence suggesting that the Department influenced AAAS's decision not to

22

renew her fellowship." JA 563. That's incorrect. State itself acknowledged its involvement and has never argued otherwise. *See* JA 248 (¶ 97), 503 (¶ 97), 231, 428-29.

> **2.    State altered the terms, conditions, and privileges of Qashu's employment when it denied her a leadership position.**

The ADA prohibits employers from "discriminat[ing] against a qualified individual" in her "terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), and courts may "presume that Congress was aware of [judicial] interpretation of 'terms, conditions, or privileges of employment' [in Title VII] when it chose to use parallel language in the ADA," *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 175-76 (4th Cir. 2001). The phrase "terms, conditions, and privileges of employment" is "capacious." *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc) (interpreting identical language in Title VII). And "[b]y leaving undefined the phrase 'terms, conditions, or privileges of employment,' the Congress 'evince[d] a[n] … intent to strike at the entire spectrum of disparate treatment … in employment.'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Taken together, then, "[t]erms," "conditions," and "privileges" refer to the gamut of workplace requirements, obligations, customs, and benefits that an employer imposes on, withholds from, or grants to an employee. *See City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978); *see also Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976).

From April to October 2016, Qashu worked as second-in-command to Salmeron on the ocean-acidification team. JA 290-91, 257 (¶ 13), 268-69 (¶ 43), 201 (¶ 56), 524. When Salmeron left, State chose to assign Boeck, a new fellow with almost no relevant experience or credentials, as the new ocean-acidification manager. *See* JA 201 (¶ 56), 280, 203-204. This lead role was an opportunity for professional and career development because it offered substantive work experience, interagency visibility, and networking opportunities at several international conferences. *See* JA 291, 280, 201 (¶ 56). Immediately after State appointed Boeck as the ocean-acidification manager, Voltmer told Qashu that, despite Voltmer's earlier promise that Qashu could attend the Governor's conference, Qashu could no longer do so. JA 291, 201 (¶ 56).

The district court found that assigning the portfolio to Boeck instead of Qashu did not implicate her terms, conditions, or privileges of employment because "[s]he was not hired on specifically to do that work." JA 559. That conclusion is wrong on its own terms. Qashu's job description specifically said that she "provides expert scientific advice on … ocean acidification." JA 519. Regardless, the job description is irrelevant. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (rejecting "narrow contractual" understanding of "terms, conditions, or privileges"). The question is what the employer actually demands of, withholds from, or bestows on its employees. *See Chambers*, 35 F.4th at 874. As the EEOC has explained, "terms, conditions, and privileges of employment" include "discriminatory work

24

environment; duration of work; work rules; *job assignments and duties*; and *job advancement*." EEOC Compliance Manual § 613.1(a) (emphasis added).

Under the district court's interpretation of the statutory language, an employer could refuse to promote an employee to a higher role and cite her disability as the reason, and the employee would have no claim under the ADA if that new role was not what she was "hired on specifically to do." JA 559. Indeed, in the district court's view, the employer could post a sign saying "we don't give employees with disabilities desirable assignments unless they were explicitly listed in their job description," and the Rehabilitation Act would have nothing to say about it. That cannot be right. Simply put, State chose to advance Boeck instead of Qashu—the functional equivalent of a failure to hire, *see Chambers*, 35 F.4th at 875—so the terms, conditions, and privileges of Qashu's employment were affected. The district court erred in holding otherwise.

### 3. State altered the terms, conditions, or privileges of Qashu's employment when it restricted her job responsibilities.

Before October 25, 2016, Qashu worked extensively on ocean acidification. *See* JA 524, 215. During the same October 25 meeting where Voltmer told Qashu that Boeck was the new ocean-acidification manager, Voltmer informed Qashu that, going forward, she would only provide clerical assistance to Boeck. JA 279, 291. Voltmer told Qashu she was "no longer allowed to speak" at staff and interagency meetings unless given

permission by Boeck. JA 291, 257 (¶ 12). Qashu did not substantively work on ocean acidification after the meeting. JA 256-57 (¶ 11).

As explained above, work assignments are terms, conditions, or privileges of employment because they determine the nature and scope of the employee's job, are agreed to between the employer and employee, and invest both parties with particular rights and obligations. *See* EEOC Compliance Manual § 613.5. Although Qashu "maintained the same title," and her "salary, benefits, and grade remained the same," the change in her daily job responsibilities affected the terms, conditions, and privileges of her employment. *See Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607-08 (D.C. Cir. 2010). And this "less prestigious and more administrative" role meant that Qashu was no longer allowed to communicate with colleagues in other offices, which affected the terms, conditions, and privileges of her employment because it gave her "fewer opportunities to work on important [issues], as well as to network." *See Muldrow v. City of St. Louis*, 601 U.S. 346, 351-52 (2024) (quotation marks omitted).

The district court further determined that Qashu's injury "does not rise to the level of conduct that the statute targets." JA 562. To the extent that the court was requiring Qashu to show a materially adverse employment action, *see id.* (citing *Flaherty v. Gas Rsch. Inst.*, 31 F.3d 451, 457 (7th Cir. 1994)), it applied a standard that is no longer good law, *see Chambers*, 35 F.4th at 872 (overruling precedent that required employee to show "objectively tangible harm"); *see also Muldrow*, 601 U.S. at 357-58 (rejecting a "materially adverse"

26

standard in the anti-discrimination context). Qashu alleged discrimination in her employment with State. That is enough to invoke the Rehabilitation Act's protections.

### B. A reasonable jury could conclude that State discriminated against Qashu because of her disability.

Proof of discriminatory intent under the Rehabilitation Act follows the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). Under that framework, the plaintiff must make out a prima facie case of discrimination. *Id.* If she does, the burden shifts to the employer to offer a nondiscriminatory explanation for its actions. If the employer meets that burden, the plaintiff must then show that the employer's explanation is pretext for discrimination. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Figueroa v. Pompeo*, 923 F.3d 1078, 1092 (D.C. Cir. 2019). A plaintiff proves pretext "by showing that the employer's proffered explanation is unworthy of credence." *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (quoting *Burdine*, 450 U.S. at 256).

The *McDonnell Douglas* analysis is abbreviated when the employer has met its burden at step two by offering a nondiscriminatory reason. Then, proof of the prima facie case is off the table, and all that remains is one central question: whether a reasonable jury could find that the employer's explanation was pretext for discrimination. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Because State offered reasons for (1)

27

Qashu's fellowship nonrenewal and (2) its failure to give Qashu leadership of the ocean-acidification work, this "*Brady* shortcut" applies to those claims. *Figueroa*, 923 F.3d at 1086-87. But because State has not even offered a reason for restricting Qashu's ocean-acidification duties, we use the full *McDonnell Douglas* framework for that claim.

### 1.    A reasonable jury could believe that State's explanations for Qashu's fellowship nonrenewal are pretextual.

To prove that an employer's proffered reasons are pretextual, plaintiffs may point to, among other things, "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Evans v. Sebelius*, 716 F.3d 617, 620 (D.C. Cir. 2013). Here, State offered various reasons for Qashu's nonrenewal including her supposed failure to properly submit renewal paperwork, her purported inability to meet the needs and interests of the office, her requests for trainings and travel to conferences, and her supposed inability to commit to staying at the Office of Polar Affairs. These shifting explanations, in addition to State's unperturbed reactions to conduct that supposedly justified Qashu's nonrenewal, its reliance on suspect subjective considerations, and its refusal to identify the decisionmaker all indicate that State's reasons for Qashu's fellowship nonrenewal are pretextual.

**a. Shifting explanations.** State's justifications for Qashu's fellowship nonrenewal have shifted over time, which, standing alone, can establish pretext. *Domínguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000); *see also Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011).[4]

State first asserted in Qashu's nonrenewal letter that her fellowship was not renewed because she did not submit the paperwork on time. JA 231. When Qashu presented evidence that she had signed her paperwork on time, AAAS told her she had never submitted full documentation with her signature and initials in the right places. JA 454-55. If those paperwork problems were the actual reasons for Qashu's nonrenewal, presumably State's designated representative should have known and been able to address them in her deposition. But State's 30(b)(6) deponent, Schwier, testified that it was unclear "whether [Qashu] ever completed the paperwork necessary for renewal." JA 346. Schwier then stated that she did not know if any paperwork problems contributed to the determination to rescind Qashu's fellowship. JA 347. State thus has not consistently committed to its first purported reason for not renewing Qashu's fellowship: her purported failure to properly submit paperwork.

---

[4] As previously mentioned (at XX), State and AAAS jointly made the decision not to renew Qashu's fellowship, so any explanation given to Qashu by either applies to both.

In another line of the nonrenewal letter, State claimed that discussions with Qashu and her host office indicated that "the match of [Qashu's] skills and interests to the focus and needs of the office is not aligned." JA 231. But Qashu *and* both of her supervisors denied ever having these discussions. *See* JA 274 (¶ 26-27), 377, 394. Regardless, State's 30(b)(6) representative never mentioned this supposed mismatch as a reason for Qashu's nonrenewal, and State never cited this reason again.

Qashu was offered a completely different reason for the nonrenewal in a meeting with AAAS Program Managers Kempinski and Dana, in which Dana did not mention paperwork at all and instead told Qashu that her offer was rescinded because she asked for too much, too early on. JA 67. Dana added other vague reasons why Qashu's renewal was revoked: Qashu's travel had been taken away from her, her other opportunities had been reduced, and "one office complained to Dave [Sohier] and Evan Bloom" about Qashu. JA 68-69.

A few days later, in a response to an email from Qashu, AAAS Director Robinson told Qashu that "there is no longer a sufficient match to support a second fellowship year," adding that Qashu had never submitted full documentation to AAAS. JA 454. Though this echoed some of the reasoning in the earlier nonrenewal letter, JA 231, Robinson never mentioned that Qashu's offer was rescinded because she made too many requests or had responsibilities taken from her, *see* JA 454.

In State's discovery responses, instead of citing a supposed mismatch of Qashu's skills and its needs, as it had earlier, JA 321, State pointed to Qashu's purported inability to commit to remaining with her office and supervisor for a second year as a reason for her nonrenewal, JA 428. But State took a different position in its 30(b)(6) deposition, explaining that it was "not sure" how Qashu's efforts to change her designated office and mentor influenced State's decision not to renew her. *See* JA 346.

To put it charitably, State never provided Qashu a consistent explanation for her fellowship nonrenewal, and that inconsistency is probative of pretext. *See, e.g., Cruz v. McAleenan*, 931 F.3d 1186, 1195 (D.C. Cir. 2019); *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1119 (D.C. Cir. 2016).

**b. False explanations and unperturbed reaction.** A plaintiff can prove discrimination by showing that a purported nondiscriminatory explanation is false. *See Czekalski v. Peters*, 475 F.3d 360, 366 (D.C. Cir. 2007). Some of State's proffered reasons for Qashu's nonrenewal are provably false. State maintains that Qashu failed to submit paperwork to formally accept her fellowship offer on time. JA 231. But Qashu came to her initial meeting with Kempinski with signed paperwork. JA 62. State does not contest that, after the meeting, Qashu was given an extension so that AAAS could address her concerns with the paperwork and its inaccuracies. *See* JA 62, 449. A reasonable jury could find that Qashu received an open extension that would not expire without a warning from AAAS or State that the extension was about to end.

After State provided this extension, Qashu did not simply wait for AAAS to send her revised paperwork. Rather, Qashu offered several times to come by the AAAS office to sign any updated paperwork. JA 449. For weeks, she repeatedly called and emailed about the paperwork, but neither AAAS nor State ever provided Qashu with corrected, accurate paperwork. JA 64. Just days before AAAS drafted Qashu's nonrenewal letter, Dana emailed Qashu to confirm that she was okay with a change to the paperwork, designed to address one of Qashu's primary concerns: Sohier's designation as her "mentor." *See* JA 229-30, 226, 452. Even after Qashu received the fellowship nonrenewal letter, she attempted to prove that she had previously tried to submit signed paperwork and offered to remedy the supposed paperwork problem by completing any additional forms. *See* JA 454-55. Robinson declined to allow Qashu to do so. *Id.* A reasonable jury could find that Qashu's repeated efforts to complete accurate renewal paperwork, and State's and AAAS's failures to support her in doing so, indicate that the late-paperwork explanation was false and therefore pretextual.

Moreover, in their communications with Qashu, neither AAAS nor State ever expressed any concern that Qashu's paperwork was still unsigned weeks after the initial deadline (which had been extended). When an employer has an unperturbed reaction to an employee's conduct, its later use of that same conduct to justify its adverse employment action casts doubt on the employer's credibility. In *DeJesus v. WP Co.*, 841 F.3d 527 (D.C. Cir. 2016), the employer claimed that the employee was terminated for ordering a study

32

without authorization, and this Court explained that a supervisor's unperturbed contemporaneous reaction to the purportedly dischargeable offense cast doubt on the employee's proffered reason. *Id.* at 534.

State and AAAS cared even less than the employer in *DeJesus*. Initially, they casually and unambiguously extended the paperwork deadline. *See* JA 62, 449. From that point on, they did not seem concerned that Qashu had not yet submitted updated paperwork and continued to offer slow or nonexistent responses to her emails and calls, which draws into serious question the credibility of State's late-paperwork explanation.

**c. Suspect subjective considerations.** State contends that considerations of "fit"—such as Qashu's skills and interests supposedly not aligning with the office's needs—drove the nonrenewal decision, JA 231, but that explanation is not credible. Subjective considerations generally should be treated with caution at summary judgment. *See Aka*, 156 F.3d at 1298 (noting that "an employer's heavy use of highly subjective criteria, such as interpersonal skills, could support an inference of discrimination" (internal citations omitted)); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012); *Harris v. Grp. Health Ass'n.*, 662 F.2d 869, 873 (D.C. Cir. 1981).

State asserted that discussions with Qashu and her host office indicated that "the match" of her skills and interests to the focus and needs of the office was not "aligned." JA 231. State's reliance on these subjective considerations is particularly suspect considering that no one acknowledges even discussing this supposed mismatch. Sohier says that he did not recall having

any discussions suggesting that Qashu's skills and interests were not aligned with the focus and needs of the office because the office was "prepared to take her for a second year." JA 377. Bloom, one of Qashu's supervisors, offered a similar perspective: "I think she was good enough to continue for a second year." JA 396. Still, State repeatedly relies on these subjective considerations, *see* JA 231, even though, as indicated, neither Qashu nor her supervisors suggested that any discussions about a mismatch even took place.

**d. No one takes responsibility for the decision.** This Court has explained that when relevant decisionmakers take different views on *who* cancelled an employee's position, the employer's general explanations for cancelling the position may demonstrate pretext. *Evans*, 716 F.3d at 620-21. Here, no one at State or AAAS has taken responsibility for the decision to revoke Qashu's fellowship, nor has State identified a specific decisionmaker ultimately responsible for Qashu's nonrenewal. Indeed, State has provided contradictory answers as to who was involved in the decision-making process at all. Though State's discovery responses say that Sohier and Bloom were not involved in the decision, JA 429, Schwier stated that Sohier and Bloom were both "part of th[e] leadership team making decisions" in the Office of Polar Affairs and would have had to sign off on Qashu's fellowship renewal, JA 211.

Throughout this litigation, State identified multiple people who were potentially involved in Qashu's nonrenewal but could not identify their roles

34

in the decision. JA 428-49. State's failure to identify any ultimate decisionmakers could indicate to a reasonable jury that State's reasons for Qashu's nonrenewal are pretextual.

**e. Discriminatory statements.** The discriminatory statements and actions by Qashu's supervisors also support Qashu's position that State's proffered reasons are pretextual. *See Stoe v. Barr*, 960 F.3d 627, 643 (D.C. Cir. 2020). This kind of evidence can be an indicator of pretext even when the disparaging comments arise in a setting not directly related to the contested employment action. *Id.*

Because AAAS and State have refused to identify the primary decisionmaker for Qashu's nonrenewal, we do not know if and how Sohier and Bloom were involved in the nonrenewal decision. To the extent that a jury could conclude that they were involved in the decision, their discriminatory behavior is additional evidence that State's proffered reasons for Qashu's nonrenewal are pretextual.

Recall that Qashu's superiors were openly hostile to Qashu's use of assistive technology and services from State's Disability and Reasonable Accommodation Division. *See* JA 255 (¶ 7), 300 (¶¶ 5-6). Sohier scolded Qashu and a Disability and Reasonable Accommodation Division employee for taking too long to install printing software, scoffing "[d]on't you see that people have better things to do and have work to do?" JA 255 (¶ 7). And another state employee, Cahoon, said it seemed clear that management did

not want Qashu around and "other employees were frequently treated better than the employees with disabilities." JA 300 (¶¶ 5, 8).

As described earlier (at 9), after Sohier was reprimanded for his disrespectful behavior toward Qashu when she received assistance for her disability, he began making offensive pelvic gestures toward Qashu because of her visual disability (presumably because he thought she wouldn't notice). JA 61, 71, 72. When Qashu attempted to report this behavior to Bloom, he rebuffed Qashu, saying he would discuss only policy, not "office issues." JA 261 (¶ 19). Bloom also exhibited discriminatory behavior: No matter which direction he was facing when Qashu entered his office, he would immediately turn his back to her. JA 260 (¶ 18). This Court has held that an incident mirroring Bloom's conduct—in which the plaintiff's boss turned his back on a female subordinate who disagreed with him in a meeting—was evidence of pretext. *Czekalski*, 475 F.3d at 368.

> ### 2.    A reasonable jury could believe that State's explanation for denying Qashu leadership of the ocean-acidification work is pretextual.

State asserts, and the district court accepted, that State's promotion of Boeck over Qashu occurred only because "neither the departing employee nor [Qashu] herself" recommended transferring the work to Qashu. JA 560-61. But Salmeron—the departing employee who led the ocean-acidification work, JA 201 (¶ 56), 290—did recommend Qashu's continued primary role in ocean acidification work, and Qashu's supervisor, Voltmer, told Qashu

that she also supported Qashu in that role. JA 290-91. In these circumstances—with other departmental employees supporting her promotion—Qashu understandably did not independently and expressly recommend herself for the promotion.

The district court acknowledged that Qashu disputed State's justification by asserting that Salmeron recommended she take on the work, yet it treated the justification as undisputed because the evidence Qashu cited "says nothing of the sort." JA 560 n.5. That's simply wrong. The evidence Qashu cited unambiguously says that "Salmeron recommended that Dr. Qashu continue the work," and that, after speaking with Qashu and Salmeron, Qashu's supervisor "Voltmer indicated that she supported Dr. Qashu's continued primary role on the ocean acidification portfolio." JA 290-91. State has admitted that this conversation occurred. JA 250 (¶ 114), 504 (¶ 114). Beyond this dispute about State's justification, other evidence suggests that its explanation is a pretext for discrimination.

**a. Qashu was substantially more qualified than Boeck.** "[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *see Gilbert v. Napolitano*, 670 F.3d 258, 262 (D.C. Cir. 2012). "[I]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate— something that employers do not usually do, unless some other strong

consideration, such as discrimination, enters into the picture." *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc)).

The gap between Qashu's and Boeck's credentials was so vast that a reasonable jury could conclude that State chose Boeck for discriminatory reasons. Qashu has two relevant postgraduate degrees: a master's in Marine Resource Management and a Ph.D. in Arid Lands Resource Sciences. JA 254 ¶ 1, 241 ¶ 38, 182. Boeck's only arguably relevant credential was an undergraduate minor in Environmental Policy. *See* JA 203-04. Their pay grades reflected this huge difference in credentials: Qashu was a GS-12 and Boeck was a GS-5. JA 42, 280, 250 (¶ 117), 504 (¶ 117); *see supra* at 3 n.2.

In *Lathram v. Snow*, 336 F.3d 1085, 1092 (D.C. Cir. 2003), the plaintiff was passed over for a position although she had four important qualifications: (1) previous work in the same role, (2) a "specializ[ation] in" relevant issues, (3) "much or all" of the relevant portfolio "was work that [she] had previously been performing," and (4) her supervisor described her work as "excellent." The person hired had "no experience" in relevant industries, so there was "evidence from which a reasonable jury could conclude that there was a wide and inexplicable gulf" between their qualifications and then "infer discrimination from the agency's choice." *Id.* at 1091.

The same wide gulf exists here. Qashu, like the plaintiff in *Lathram*, had already achieved considerable success in relevant work. JA 524. Her ocean-acidification work was uniformly rated "Exceeds Expectations" in her sole

performance review. JA 520. The outgoing ocean-acidification manager recommended that she lead future projects because of her "positive results." JA 290-91. And Boeck, like the person ultimately hired in *Lathram*, 336 F.3d at 1091, had no relevant work experience (and, as mentioned, little or no relevant educational background either). A reasonable jury could therefore find pretext.

**b. State's proffered justification is flawed.** Even if these disparities between Qashu and Boeck are alone insufficient to take pretext to a jury, a jury could consider them "together with 'other flaws in the employer's explanation,' [to] still reach a verdict" for the plaintiff. *Hamilton*, 666 F.3d at 1355 (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

First, State's proffered explanation lacks "contemporaneous documentation." *Hamilton*, 666 F.3d at 1355. State did not offer any contemporaneous evidence indicating that Qashu was denied the ocean-acidification position because neither she nor the departing employee recommended her for the role. The first time State relied on that reasoning was Voltmer's EEO affidavit, filed almost a year later. *See* JA 201-02.

Second, "it is unclear who" at State made the decision to promote Boeck. *Evans v. Sebelius*, 716 F.3d 617, 621 (D.C. Cir. 2013). Voltmer asserted that "Bloom made the final decision on … ocean acidification." JA 201 (¶ 56). But Bloom claimed to not remember making any relevant decision. *See* JA 118.

Third, State's explanation is "unworthy of credence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). As previously discussed (at 37),

because Salmeron recommended that Qashu continue in her primary role in ocean acidification and Voltmer agreed, it is understandable that Qashu did not also make an express request. Furthermore, a request is not a prerequisite to promotion—and State has never indicated that Boeck requested the role that Qashu was denied. State's own 30(b)(6) deponent felt the need to expand on State's justification, relying on additional nebulous reasoning that "leadership of that office made determinations based on work levels and other things as relevant." JA 216.

Fourth, as explained above (at 36), Qashu produced evidence of her supervisors' discriminatory statements and actions, which supports a finding of pretext. *See Stoe*, 960 F.3d at 643. Between the holes in State's purported justification and independent testimony that "management did not want [Qashu] around," a reasonable jury could find that State's explanation is pretext for discrimination. JA 300 (¶ 5).

### 3. State did not attempt to explain why it restricted Qashu's responsibilities to assisting a less-qualified employee.

Under *McDonnell Douglas*, a plaintiff establishes a prima facie case by showing she (1) is a member of a protected class, (2) suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Qashu's disability is undisputed, satisfying the first prong. And, as explained earlier (at 25-26), having one's job tasks restricted is actionable, satisfying the second prong.

40

The circumstances here support an inference of discrimination under the third prima facie element because Voltmer restricted Qashu's duties in the same meeting where she promoted Boeck, JA 79, 256-57 (¶¶ 11-12), 280, so all evidence that State's justification was pretext for discrimination (explained at 39-40) is equally applicable here. An inference of discrimination also exists because one way "to satisfy [the] third prong is to show that the adverse employment action is not attributable to the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *George*, 407 F.3d at 412 (quotation marks omitted). That is true here: Qashu was qualified, and the management role was vacant.

State has never attempted to explain why, after months of successful work, *see* JA 524, Qashu's responsibilities were limited to "staff[ing]" and "provid[ing] clerical support to" Boeck, "do[ing] what [she] was told," and not speaking in interagency meetings, JA 256-57 (¶¶ 11-12), 79. *See* ECF 33 at 14-15; JA 562-63. When an employer "has failed to meet [its] burden of production" under *McDonnell Douglas* step two, this Court must "revive the disparate treatment claim." *Figueroa v. Pompeo*, 923 F.3d 1078, 1094 (D.C. Cir. 2019).

41

## II.    State failed to accommodate Qashu.

To prevail on a failure-to-accommodate claim, an employee must show that (1) she is disabled, (2) her employer had notice of the disability, and (3) the employer denied the employee's request for reasonable accommodation. *Ali v. Regan*, 111 F.4th 1264, 1268-69 (D.C. Cir. 2024). No one disputes that Qashu was a qualified individual with a disability and that State had notice of her disability. *See* JA 33 (¶ 2), 174-82, 384, 351, 238 (¶¶ 2, 64, 65), 498 (¶¶ 64, 65). The only dispute is whether State denied Qashu's requests for reasonable accommodations.

### A.    State denied Qashu's requests for reasonable accommodations by failing to engage in good faith in the interactive process.

"To 'establish that [an accommodation] request was "denied," [a plaintiff] must show either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith.'" *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015). The interactive process is "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" *Ali*, 111 F.4th at 1269 (citing *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)); *see* 29 C.F.R. § 1630.2(o)(3). Its purpose is to allow the employer and employee to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). An employer's obligation to engage in the interactive process is triggered when an employer

42

has "enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3rd Cir. 1999) (citing EEOC guidance and 42 U.S.C. § 12112(b)(5)(A)); *see also Kowitz v. Trinity Health*, 839 F.3d 742, 746-48 (8th Cir. 2016).

Employers engage in the interactive process in bad faith when they "obstruct or delay the interactive process, or fail to communicate, by way of initiation or response." *Ward*, 762 F.3d at 32 (cleaned up); *see Ali*, 111 F.4th at 1276-77. "[I]f a jury could conclude that [the employer] failed to engage in good faith in the interactive process, and that failure led to" reasonable accommodations not being provided "in a timely manner, summary judgment cannot be granted." *Pantazes v. Jackson*, 366 F. Supp. 2d 57, 70 (D.D.C. 2005).

State effectively denied Qashu's requests for reasonable accommodations. First, State did not communicate with Qashu to find reasonable additional accommodations even though it knew she had challenges doing her job with the accommodations provided. Second, State unreasonably delayed providing some of Qashu's accommodations.

1. **State was aware of Qashu's need for accommodations but did not work collaboratively with her to provide reasonable accommodations.**

"If a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function,

43

the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." U.S. Equal Emp. Opportunity Comm'n, *EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, No. 915.002 (Oct. 17, 2002). This requirement means that the employer has "a continuing obligation to engage in the interactive process 'when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing,'" so a single attempt to provide reasonable accommodations does not exhaust that duty. *U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1112 (9th Cir. 2010). This continuing duty "encourag[es] employers to seek to find accommodations that really work." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).

Because Qashu informed State about her need for accommodations through her initial requests, State had a continuing duty to engage in the interactive process in good faith once it learned about her difficulties completing various aspects of her job. *See supra* at 5-7. Without adequate accommodations, Qashu had trouble drafting and reviewing emails, researching, drafting and reviewing documents and spreadsheets, using shared office equipment, attending meetings, and completing trainings, which were essential functions of the job. *See supra* at 7-8. State failed to engage in a collaborative process with Qashu to provide reasonable accommodations to enable her to do her job.

**a. Zoomtext and JAWS accommodations**. State did not address the problems with Qashu's Zoomtext and JAWS. Qashu first informed State about her need for Zoomtext and JAWS on a stable, functional computer months before she started her job, but State did not check if her State-provided computer was compatible with Zoomtext and JAWS. *See* JA 288, 329, 331. Nor did State know whether Zoomtext and JAWS were enabled to function on her computer. *See* JA 327.[5]

As a result, for the first four months of her fellowship, Qashu's computer regularly froze and crashed, leaving her unable to do some of the essential functions of her job, like reading emails and reviewing and drafting documents. *See* JA 271-72 (¶¶ 7-8), 310. Similarly, Qashu's adaptive software did not work well with her login portal, so she spent considerable time simply logging into her computer instead of doing her work. *See* JA 272 (¶¶ 11-12). The problems continued until State provided her with a functional computer, nine months into the twelve-month fellowship. *See* JA 271-72 ¶¶ 7-9, 463-66.

State was aware of these problems but did not engage with Qashu to address them. *See* JA 264 (¶ 29), 272-73 (¶¶ 12-13), 487-88, 463-66. In *UPS Supply Chain Solutions*, 620 F.3d at 1112-13, the employer violated its continuing duty to engage in the interactive process in good faith by

---

[5] The district court faulted Qashu for (supposedly) insisting on using technology that State had informed her would not work, *see* JA 568 (citing JA 182 (also referred to as Bates 2644)), but the record nowhere suggests Qashu did that.

"fail[ing] to explore possible accommodations" when it "knew or should have known that the [employee's accommodations] were not effective." It did not matter that the employer already granted the employee multiple accommodation requests, because the employee made additional requests, and the employer did not consider a reasonable and effective accommodation in response to the additional requests. *See id.* at 1106-07, 1112-13.[6]

As in *UPS*, a reasonable factfinder here could find that State violated its continuing duty to engage in the interactive process. For three quarters of Qashu's fellowship, she regularly could not attach documents to emails, use Zoomtext or JAWS on her login portal, or read the font on her computer. *See* JA 272 (¶ 10), 260 (¶ 17), 516. Qashu reported these technological problems, *see* JA 190-92, so State knew or should have known that Qashu's accommodations were not effective. State then had a duty to consider possible accommodations for Qashu, but it failed to engage in an interactive process to ensure that she had Zoomtext and JAWS accommodations that would allow her to perform the essential functions of her job. State can therefore be held liable for failing to reasonably accommodate Qashu's disability. *See Perkins v. City of New York*, 2023 WL 370906, at *4-5 (2d Cir. Jan.

---

[6] Because Qashu informed State about her disability, this case is unlike other cases where this Court determined that the defendant could not be liable because the plaintiff failed to provide information about her disability. *See, e.g.*, *Ward v. McDonald*, 762 F.3d 24, 32-33 (D.C. Cir. 2014); *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307-08 (D.C. Cir. 2010).

24, 2023) (holding employer violated its duty to engage in the interactive process by failing to address employee's request for help with a malfunctioning accommodation); *Kowitz v. Trinity Health*, 839 F.3d 742, 746-48 (8th Cir. 2016) (same).

The district court noted Qashu's emails conveying gratitude for some of State's actions as evidence of State's good-faith engagement in the interactive process. *See* JA 567. But because State was aware that the accommodations provided to Qashu were ineffective, Qashu's civility is not enough to absolve State of its continuing duty to engage in the interactive process.

**b. Alternative meeting-notification accommodation.** State also did not address Qashu's difficulty attending meetings. Qashu's meeting notifications and reminders were not compatible with Zoomtext and JAWS, preventing the necessary meeting information from being properly conveyed to her. *See* JA 273 (¶ 14). Qashu informed her supervisors about her difficulty attending meetings but did not receive any assistance. *See* JA 289, 389, 369-70. Sohier instead expected Qashu to see other people going to meetings and then tag along. *See* JA 364-68. But given her disability, she could not see other people going to meetings, and her State-issued headphones, which she needed to listen to her JAWS voice-assistive software, made it difficult to hear colleagues going to meetings. *See* JA 273 (¶¶ 18-19).

A reasonable jury could find that Qashu made a request for an accommodation, and because State knew of Qashu's disability and desire for

accommodations, it was obliged to engage in the interactive process to find a reasonable accommodation. *See Taylor*, 184 F.3d at 313. In *Taylor*, the Third Circuit indicated the plaintiff's reasonable-accommodation claim was actionable even if she "did not request a specific accommodation," because the interactive process "requires the employer to take some initiative" and to "help the disabled employee devise accommodations." *Id.* at 315, 317. The employer could be liable for engaging in the interactive process in bad faith if "the jury [could] reasonably conclude" that "had the employer participated in good faith, there may have been other, unmentioned possible accommodations." *See id.* at 317-18. As in *Taylor,* a reasonable jury here could find that State did not engage in a dialogue with Qashu to consider possible accommodations to try to resolve her meeting-notification problems and that Qashu missed meetings essential to her job as a result. *See* JA 289.

**c. Shared-office-equipment accommodation.** State similarly did not try to address Qashu's difficulty using the shared office equipment. Qashu's supervisors knew she might need to use the shared office equipment but admitted that nothing was done to make the equipment accessible. *See* JA 373, 393. The handheld magnifier State provided did not enable her to read or see the equipment properly. *See* JA 273 (¶ 17). And Sohier refused to talk to Qashu about her need for accommodations to make the printer accessible. *See* JA 255 (¶ 7). Without accommodations, she could not print, photocopy, or send faxes to complete key functions of her job. *See* JA 289.

**d. Reader accommodation.** State also did not address Qashu's difficulty obtaining assistance from "readers," employees in State's Disability and Reasonable Accommodation Division who could help her read her computer text. Qashu requested readers so she could complete work assignments and required trainings, but State did nothing to ensure that Qashu had timely access to the readers. *See* JA 256, 260 (¶¶ 10, 17), 309, 486, 463-66. Because State had a limited number of readers, a request could take weeks to fulfill, preventing Qashu from completing her required trainings on time. *See* JA 334-35, 260 (¶ 17), 486-87, 463-66. Like the employer in *UPS*, State can be held liable because it was aware of the ineffectiveness of the reader accommodation but did not explore possible alternative accommodations, such as giving Qashu priority access to readers. *See UPS Supply Chain Sols.*, 620 F.3d at 1112-13.

### 2. State unreasonably delayed providing Qashu with accommodations.

Qashu's reasonable-accommodation claim should go to a jury for another reason: the delays in providing her accommodations. A "long-delayed accommodation" can be "unreasonable and hence actionable under the ADA." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (quotation marks omitted); *see McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). In addition to considering length alone, courts may consider other factors to determine whether a delay is unreasonable, such as "the reasons for the delay" and if "the employer has offered any alternative

accommodations while evaluating a particular request." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015). A delay can be unreasonable if an employer does not inquire into temporary or alternative accommodations during the delay. *See McCray*, 966 F.3d at 622. State initially agreed to employ Qashu for one year. The length of its two delays was unreasonable under the circumstances.

First, State's nine-month delay (from the start of her fellowship in February until November) in responding to Qashu's request for an upgraded computer with a working fan was unreasonable. *See* JA 266-67 (¶ 37), 272 (¶¶ 8-9). During the delay, State never asked Qashu what alternative accommodations she needed to get her work done. This delay, in addition to the Zoomtext and JAWS login and meeting-notification problems discussed above (at 45-48), prevented Qashu from fully using Zoomtext and JAWS to perform the essential functions of her job. *See* JA 271-72 (¶¶ 7, 21), 310.

Second, a jury could determine that the seven-month delay in providing Qashu a quieter office space was also unreasonable. Qashu asked State for a new office in March, April, and October 2016, because her office was too noisy to hear her JAWS software. *See* JA 266-67 (¶ 37), 273 (¶ 21), 288. Multiple empty offices were available when Qashu made her request, *see* JA 266-67 (¶ 37), but State did not grant Qashu's request during this long delay, *see* JA 266-67 (¶ 37), 274 (¶ 23).

Even if State had a reason for not giving Qashu one of the empty offices (which it has not offered), State can be held liable because it did not engage with Qashu to try to figure out "what else could be done" to accommodate her need for a quiet office during its delay. *McCray*, 966 F.3d at 622. The district court observed that Qashu got noise-cancelling headphones as an alternative accommodation for the quiet-office-space accommodation request. *See* JA 569. That's wrong. Qashu did not request a quieter office space until *after* she had received noise-cancelling headphones in February 2016. *See supra* at 5-6; JA 288. The noise-cancelling headphones therefore could not have functioned as an alternative accommodation to deal with the delay in providing her one of the empty offices. *See* JA 288. This delay, in addition to the computer-hardware problems discussed above, meant Qashu could not properly use JAWS to perform the essential functions of her job. *See supra* at 45-47; JA 271-72 (¶ 7). A reasonable jury could thus find that the delay was unreasonable.

### III. Qashu established retaliation claims under the Rehabilitation Act.

The Rehabilitation Act prohibits retaliation against an individual because she has exercised her rights under the Act. 42 U.S.C. § 12203(a). To prove retaliation, Qashu must show that (1) she engaged in statutorily protected activity; (2) State took a materially adverse action against her; and (3) her protected activity was a but-for cause of that adverse action. *Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024).

Qashu alleged two retaliation claims: retaliation for requesting a reasonable accommodation that resulted in her fellowship nonrenewal and retaliation for filing an EEO complaint that resulted in significantly diminished ocean-acidification responsibilities. JA 29-30. It is undisputed that requesting reasonable accommodations and filing an EEO complaint are protected activities. *See Solomon v. Vilsack*, 763 F.3d 1, 15 (D.C. Cir. 2014); *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012).

### A.     State took three materially adverse actions against Qashu.

A materially adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

For the reasons already explained (at 23-25), both the nonrenewal and the promotion of Boeck over Qashu are materially adverse. The denial of Qashu's opportunity to take over the lead ocean-acidification role "clearly had materially adverse consequences for [her] present and future employment opportunities." *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) (ruling that the denial of a supervisor's job after it became vacant was materially adverse).

The restriction of Qashu's ocean-acidification duties was just as adverse. When the plaintiff "alleges retaliation based on a reassignment, the fact-finder must compare the position the plaintiff held before the transfer to the one [she] holds afterwards." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607

52

(D.C. Cir. 2010); *see also Burlington N.*, 548 U.S. at 70-71. In *Pardo-Kronemann*, 601 F.3d at 607-08, a responsibility change was materially adverse even though the plaintiff's new role included the same salary, benefits, grade, and title. It was enough that the reassignment meant that the plaintiff's "skills and education [were] not being fully utilized." *Id.* at 608. It should go without saying that forcing Qashu—a Ph.D. scientist—into clerical work meant the same.

### B.    A reasonable jury could believe that Qashu's protected activities caused the adverse actions.

A plaintiff may use any relevant evidence to show that an employer's explanation for a retaliatory decision is pretextual, including a close temporal connection between the plaintiff's protected activity and the adverse action. *E.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003). Qashu filed her initial informal EEO complaint in August, two months before the October meeting at which her ocean-acidification duties were restricted. JA 457. A two-month gap from the date she filed her informal complaint is short enough to support an inference of retaliatory intent. *See, e.g.*, *Hamilton*, 666 F.3d at 1358-59.

In addition to temporal proximity, other evidence of retaliatory intent abounds. State's shifting and provably false explanations, discussed above (at 28-35), support her claim that her fellowship nonrenewal was retaliation for her accommodation requests. Qashu's superior qualifications (reviewed at 37-39) tend to show that State failed to promote her and instead restricted

53

her substantive duties in retaliation for her EEO complaint. And Qashu's supervisors' discriminatory statements and conduct (described at 35-36) tend to substantiate both of Qashu's retaliation claims. This evidence could lead a reasonable jury to find in Qashu's favor.

## Conclusion

This Court should reverse and remand for a trial on each of Qashu's claims.

Respectfully submitted,

/s/Regina Wang

| | |
|---|---|
| Joanna Wasik | Regina Wang |
| WASHINGTON LAWYERS | Brian Wolfman |
| COMMITTEE FOR CIVIL RIGHTS | Becca Steinberg |
| AND URBAN AFFAIRS | GEORGETOWN LAW APPELLATE |
| 700 14th Street NW Ste 400 | COURTS IMMERSION CLINIC |
| Washington, DC 20005 | 600 New Jersey Ave., NW, |
| (202) 319-1069 | Suite 312 |
| | Washington, D.C. 20001 |
| Jonathan Corn | (202) 661-6741 |
| Morgan Flitt | |
| Matt Grabianski | |
| Student Counsel | |
| | Counsel for Plaintiff-Appellant |
| | Susan Qashu |

December 3, 2024

## Certificate of Compliance

This document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitations. In compliance with Rule 32(a)(7)(B), it contains 12,939 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1), and it has been prepared in proportionally spaced typeface using Palatino Linotype, 14-point, in Microsoft Word 2016.

/s/Regina Wang
Regina Wang
Counsel for Plaintiff-Appellant

## Certificate of Service

I certify that, on December 3, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system. Eight paper copies of this brief will also be filed with the Clerk of this Court.

/s/Regina Wang

Regina Wang

Counsel for Plaintiff-Appellant