ORAL ARGUMENT NOT YET SCHEDULED

No. 24-5201

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SUSAN QASHU,
Appellant,

v.

MARCO RUBIO,
Secretary of State,
Appellee.

On Appeal from the United States
District Court for the District of Columbia

## BRIEF FOR APPELLEE

EDWARD R. MARTIN, JR.
United States Attorney

JANE M. LYONS
Assistant United States Attorney

JOHNNY H. WALKER
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-2511

Civ. A. No. 22-1077          *Attorneys for the United States of America*

## CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**Parties and Amici.** The plaintiff-appellant is Susan Qashu. The defendant-appellee is the Secretary of State, Marco Rubio, who has been automatically substituted as a party pursuant to Federal Rule of Appellate Procedure 43(c)(2). There is no amicus curiae.

**Ruling Under Review.** At issue in this appeal is the July 24, 2024, memorandum opinion and order by Judge Trevor N. McFadden granting the defendant's motion for summary judgment and denying the plaintiff's cross-motion for partial summary judgment. The opinion is available in the joint appendix, JA549, and on Westlaw, 2024 WL 3521592.

**Related Cases.** This case has not previously been before this Court. Undersigned counsel is unaware of any pending related cases.

- i -

# TABLE OF CONTENTS

**Heading**                                                                                                              **Page**

Certificate as to  Parties, Rulings, and Related Cases ............................i

Table of Authorities................................................................................iv

Glossary ...............................................................................................viii

Introduction ............................................................................................ 1

Jurisdictional Statement......................................................................... 3

Statutes and Regulations......................................................................... 4

Statement of Issues ................................................................................. 4

Counterstatement of the Case ................................................................. 4

I.     Qashu's Fellowship with the Department of State......................... 4

II.    Accommodations Provided to Qashu ............................................ 6

III.   Qashu's Work on the Ocean-Acidification Portfolio ..................... 11

IV.    The Nonrenewal of Qashu's Fellowship ........................................ 14

V.     Procedural History ......................................................................... 17

Summary of the Argument ..................................................................... 20

Standard of Review ................................................................................. 23

Argument ................................................................................................ 24

I.     The Department of State Satisfied Its Obligation  to
       Accommodate Qashu's Impaired Vision. ...................................... 24

       A.    The Department of State Provided Qashu with
             Multiple Reasonable Accommodations. ............................... 28

B.    Qashu's Complaints about Her Work Equipment Do Not Establish a Failure to Accommodate.........................32

    1.    ZoomText and JAWS ....................................................33

    2.    Meeting Notification Pop-Ups .......................................38

    3.    Printers, Copiers, and Fax Machines ...........................39

    4.    Readers..........................................................................40

C.    The Department of State Did Not Unlawfully Delay Qashu's Accommodations. ....................................................42

II.    Qashu's Discrimination and Retaliation Claims Fail.....................44

A.    Qashu's Discrimination and Retaliation Claims Related to the Ocean-Acidification Portfolio Fail.................47

    1.    The Department of State's Staffing of the Portfolio Is Not an Actionable Adverse Action. ...........47

    2.    The Department of State's Staffing of the Portfolio Was Not Based on Discrimination or Retaliation. ......51

B.    The Nonrenewal of Qashu's Fellowship Was Not Based on Discrimination or Retaliation..............................56

Conclusion............................................................................................64

Certificate of Compliance

Certificate of Service

Statutory and Regulatory Addendum

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Cases**

*Aka v. Wash. Hosp. Ctr.*,
 156 F.3d 1284 (D.C. Cir. 1998) ............................................. 26, 35, 44

*Ali v. Regan*,
 111 F.4th 1264–69 (D.C. Cir. 2024) .......................... 25, 26, 27, 37, 44

*Ayissi-Etoh v. Fannie Mae*,
 712 F.3d 572 (D.C. Cir. 2013) ........................................................ 63

*Baloch v. Kempthorne*,
 550 F.3d 1191 (D.C. Cir. 2008) ...................................................... 46

*Barth v. Gelb*,
 2 F.3d 1180 (D.C. Cir. 1993) .......................................................... 45

*Brady v. Off. of Sergeant at Arms*,
 520 F.3d 490 (D.C. Cir. 2008) ........................................................ 47

*Burlington N. & Santa Fe Ry. Co. v. White*,
 548 U.S. 53 (2006) .................................................................... 49, 50

*Chambers v. District of Columbia*,
 35 F.4th 870 (D.C. Cir. 2022) ........................................................ 48

*Muldrow v. City of St. Louis, Missouri*,
 601 U.S. 346 (2024) ................................................................. 48, 49

*DeJesus v. WP Co. LLC*,
 841 F.3d 527 (D.C. Cir. 2016) .................................................. 55, 63

*Doak v. Johnson*,
 798 F.3d 1096 (D.C. Cir. 2015) ...................................................... 45

*Fischbach v. D.C. Dep't of Corr.*,
 86 F.3d 1180 (D.C. Cir. 1996) ................................................... 60, 61

*Flemmings v. Howard Univ.*,
 198 F.3d 857 (D.C. Cir. 1999) ............................................. 38, 39, 41

*Galeta v. Gray,*
645 F.3d 408 (D.C. Cir. 2011) ............................................. 57

*Hairston v. Vance-Cooks,*
773 F.3d 266 (D.C. Cir. 2014) ............................... 54, 55, 63

*Hamilton v. Geithner,*
666 F.3d 1344 (D.C. Cir. 2012) .............................. 51, 52, 53

*Mayers v. Laborers' Health & Safety Fund of N. Am.,*
478 F.3d 364 (D.C. Cir. 2007) ............................................. 42

*McDonnell-Douglas Corp. v. Green,*
411 U.S. 792 (1973) ................................................. 45, 46

*Mogenhan v. Napolitano,*
613 F.3d 1162 (D.C. Cir. 2010) .......................................... 42

*Morris v. McCarthy,*
825 F.3d 658 (D.C. Cir. 2016) ..................................... 55, 64

*Noll v. Int'l Bus. Machines Corp.,*
787 F.3d 89 (2d Cir. 2015) ......................................... 26, 35

*Nurriddin v. Bolden,*
818 F.3d 751 (D.C. Cir. 2016) ........................................... 47

*Oviedo v. WMATA,*
948 F.3d 386 (D.C. Cir. 2020) ..................................... 57, 63

*Ramos v. Garland,*
77 F.4th 932 (D.C. Cir. 2023) ..................................... 24, 49

*Rehling v. City of Chicago,*
207 F.3d 1009 (7th Cir. 2000) ..................................... 27, 28

*Solomon v. Vilsack,*
763 F.3d 1 (D.C. Cir. 2014) ............................................... 46

*St Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) ........................................................ 46

*Stewart v. St. Elizabeth's Hosp.,*
589 F.3d 1305 (D.C. Cir. 2010) .......................................... 25

*Taylor v. Rice,*
    451 F.3d 898 (D.C. Cir. 2006) ........................................................... 24

*Taylor v. Small,*
    350 F.3d 1286 (D.C. Cir. 2003) ......................................................... 24

*Ward v. McDonald,*
    762 F.3d 24, (D.C. Cir. 2014) ..................................................... 27, 36

*Wilson v. Dollar Gen Corp.,*
    717 F.3d 337 (4th Cir. 2013) ............................................................. 27

*Woodruff v. Peters,*
    482 F.3d 521 (D.C. Cir. 2007) ........................................................... 51

## Statutes

28 U.S.C. § 1331 ...................................................................................... 3

29 U.S.C. § 791 .......................................................................... 24, 44, 48

29 U.S.C. § 794 ...................................................................................... 24

29 U.S.C. § 794a ................................................................................. 3, 24

42 U.S.C. § 2000e3(a) ........................................................................... 49

42 U.S.C. § 2000e5(f)(3) ......................................................................... 3

42 U.S.C. § 2000e-2(a)(1) ..................................................................... 48

42 U.S.C. § 12111(9) ............................................................................. 26

42 U.S.C. § 12112 ...................................................................... 25, 44, 48

42 U.S.C. § 12203 .......................................................................... 45, 49

## Regulations

29 C.F.R. § 1630 app .............................................................................. 26

29 C.F.R. § 1630.2(n)(1) ........................................................ 25, 29, 30, 31

29 C.F.R. § 1630.2(n)(2) ........................................................................ 26

29 C.F.R. § 1630.2(n)(3) ............................................................... 32, 33, 34

29 C.F.R. § 1630.2(o) ...................................................................... 25, 27

- vi -

## Other

*Pamala L. v. Blinken*, No. 2020003330,
   2021 WL 3804063 (E.E.O.C. July 29, 2021) ................................ 18, 19

*Pamela L. v. Blinken*, No. 2020003330,
   2022 WL 357259 (E.E.O.C. Jan. 18, 2022) ........................................ 19

## GLOSSARY

AAAS ..................... American Association for the Advancement of Science

ADA ...................... Americans with Disabilities Act

EEO ...................... Equal Employment Opportunity

JAWS.................... Job Access With Speech

JA.......................... Joint Appendix

**INTRODUCTION**

From 2016 to 2017, Susan Qashu held a one-year fellowship in the Office of Ocean and Polar Affairs at the United States Department of State. Qashu lives with serious central vision loss and requires accommodations to read written and electronic text. The State Department accommodated Qashu's needs in various ways, including with magnification and screen-reading software, a handheld magnification device, and readers that Qashu could reserve to read materials aloud to her. Qashu nevertheless claims that the Department of State failed to accommodate her needs, largely because her desktop computer sometimes had technical problems that had to be resolved by the Department's accommodations and information-technology staff. But Qashu fails to demonstrate that at any point she was unable to perform her fundamental job duties. Further, the Department of State at all times addressed Qashu's technical issues by troubleshooting them, and, when problems persisted, the Department replaced Qashu's computer with one featuring higher specifications than are typically issued to Department employees. Given the multiple accommodations provided to Qashu and the Department's continued successful efforts to address Qashu's

computer issues, Qashu's assertion that the Department of State failed to accommodate her falls flat.

Among Qashu's duties in the Office of Ocean and Polar Affairs was to assist an employee in another office—the Office of Marine Conservation—who was the lead on a portfolio of work about ocean acidification. When that employee departed, Qashu's supervisor solicited the input of both the departing employee and Qashu about how to staff the portfolio going forward. Neither Qashu nor the departing employee suggested that Qashu should be the sole lead on the portfolio, so the Department of State assigned another employee to work with Qashu on the ocean-acidification portfolio. Qashu claims that the fact that the agency did not spontaneously designate her as the sole lead of portfolio was motivated by discrimination against her disability and retaliation for requesting accommodations. But the Department of State assigned another employee to replace the departing employee simply because neither Qashu nor the departing employee suggested otherwise. Qashu fails to show this reason to be pretext for discrimination or retaliation.

Qashu's fellowship lasted one year but could have been renewed for an additional year. The Office of Ocean and Polar Affairs wanted to renew

Qashu's fellowship, and Qashu was offered the opportunity to do so. But she declined to timely return the paperwork to renew with the Office of Ocean and Polar affairs and instead requested to be transferred to a different office. Because that request was not approved and Qashu did not timely accept the offered second year with the Office of Ocean and Polar Affairs, Qashu's fellowship was not renewed. Qashu claims that the real reason was discrimination because of her disability and retaliation for filing an informal equal employment opportunity ("EEO") complaint, but she fails to identify evidence sufficient to show that the Department's asserted reason is pretext.

For these reasons, Qashu's claims of failure to accommodate, disability discrimination, and retaliation fail. The judgment of the district court should be affirmed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). *See* 29 U.S.C. §§ 791, 794a(a)(1). The plaintiff timely appealed from the order granting summary judgment to the defendant. JA572, 573. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum submitted herewith.

## STATEMENT OF ISSUES

In the opinion of the United States, the questions presented are:

1.     Whether there is any genuine issue of material fact as to whether the Department of State provided Qashu a reasonable accommodation for her vision loss.

2.     Whether there is any genuine issue of material fact as to whether the Department of State discriminated or retaliated against Qashu by not spontaneously designating Qashu as the sole lead of the ocean-acidification portfolio.

3.     Whether there is any genuine issue of material fact as to whether the Department of State discriminated or retaliated against Qashu by not renewing Qashu's fellowship after Qashu declined to timely accept an offered renewal with the Office of Ocean and Polar Affairs.

## COUNTERSTATEMENT OF THE CASE

## I.     Qashu's Fellowship with the Department of State

In 2015, Susan Qashu was selected for a fellowship by the American Association for the Advancement of Science ("AAAS"). Letter from

- 4 -

Robinson (May 22, 2015), JA42. The AAAS is a nongovernmental, nonprofit organization that administers fellowships placing recipients within government agencies. AAAS Terms of Agreement (May 26, 2015), JA46. An AAAS fellowship is not an offer of permanent employment; it is a temporary development opportunity intended to foster a network of scientists who understand government policymaking. *Id.*, JA46. Qashu's fellowship was to last for twelve months beginning on February 7, 2016, with the possibility of renewal for another twelve months thereafter. Letter from Robinson (May 22, 2015), JA42; Letter from Lester (Dec. 31, 2015), JA56.

Qashu's prior research focused in part on marine resources, Qashu Aff. ¶ 2, JA254, so her fellowship placement was with the Department of State's Office of Ocean and Polar Affairs, Letter from Robinson (May 22, 2015), JA42, where she provided expert scientific advice on ocean-related issues such as invasive species, ocean acidification, marine conservation, and marine pollution and debris, Performance Plan & Appraisal (Feb. 7, 2017), JA519; *see also* Email from Sohier (Feb. 11, 2016), JA200. Qashu's direct and second-level supervisors in the Office were Deputy Director William Sohier and Director Evan Bloom, respectively. Bloom Dep 25:19–

26:12, JA117. In September 2016, Sohier retired and was replaced as Qashu's supervisor by Deputy Director Chever Voltmer. Email from Qashu (Sept. 26, 2016), JA196.

## II.　Accommodations Provided to Qashu

Qashu lives with a form of vision loss that makes it very difficult for her to see objects more than one foot away. Qashu Rog. Resps., No. 20, JA296. She describes her perception of such objects as "pixelated" or "like an impressionist painting." *Id.*, JA296. She can read standard-sized text using glasses with prism lenses; but the lenses strain her eyes, so she in unable to wear them for long. *Id.*, JA296–97.

The Department of State was aware of Qashu's vision issue well before her arrival and arranged extensive accommodations for her benefit. Richard McCarthy, an assistive-technology coordinator with the Department of State, communicated repeatedly with Qashu prior to her start date to ascertain what accommodations would meet her needs. Emails from McCarthy & Qashu (July to Dec. 2015), JA178–82, 183–84; McCarthy Dep. 97:5–99:15, JA163. After discussing several options with Qashu, and two months before Qashu's arrival, McCarthy listed for Qashu the various accommodations that the State Department had

acquired for her use. They were: (1) a Pearl camera that displays written materials magnified on a computer; (2) a Ruby handheld digital magnifier; (3) Job Access With Speech ("JAWS") screen-reading software installed on Qashu's desktop; (4) ZoomText magnifying software installed on Qashu's desktop; (5) a laptop computer (with ZoomText and JAWS installed); (6) a large-screen iPhone with an external keyboard; and (7) a twenty-seven-inch monitor with a monitor arm. Email from McCarthy (Dec. 17, 2015), JA183. McCarthy also noted that the Department of State was in the process of acquiring (8) an Opaltec closed-circuit camera and monitor that would allow Qashu to magnify written materials. *Id.*, JA183. Qashu proclaimed these accommodations to be "wonderful" and asked about (9) a large-print, slim keyboard, Email from Qashu (Dec. 17, 2015), which the State Department also acquired and provided to Qashu upon her arrival, List of Assistive Techs. for Qashu (Feb. 10, 2016), JA188. The Department also provided Qashu with (10) Bose noise-cancelling headphones so she could better hear her screen-reading software. *Id.*, JA189. And it made available to its employees, including Qashu, (11) "readers" who can be reserved to read materials aloud to employees with low or no vision. McCarthy Dep. 197:10–20,

JA170. Also, Bloom, the director of the Office of Ocean and Polar Affairs agreed to personally provide Qashu an advance tour of her office space to assess the lighting. Email from Bloom (Aug. 31, 2015), JA185–86.

During her one-year fellowship, Qashu praised the accommodations provided by the Department of State and specifically disclaimed any problems with them. For example, a little more than half-way through her fellowship, in September 2016, Qashu's new supervisor, Voltmer, inquired with Qashu whether Voltmer should set up an introductory meeting with the Department of State's accommodations team to discuss whether "there is some support you need from this office that you're not getting." Email from Voltmer (Sept. 22, 2016), JA195. Qashu responded that there was "[n]o need" and that the accommodations office "has been stupendous." Email from Qashu (Sept. 23, 2015), JA195. Qashu then informed the accommodations office that Voltmer would not need to meet with them "unless your office is not accommodating (WHICH your office COMPLETELY HAS, BEAUTIFULLY, Thank you ☺)." Email from Qashu (Sept. 26, 2015), JA196.

Like many people who use computers at work, however, Qashu sometimes    experienced    technology    problems    that    required

troubleshooting. For example, at some point, Qashu reported that her desktop computer was "blacking out" and requiring restarts. McCarthy Dep. 42:13–20, JA156. Qashu's brief assumes that this issue was due to her computer not being "compatible" with ZoomText and JAWS, Qashu Brief at 45, but that was never determined to be the case, McCarthy Dep. 255:11–256:21, JA173. In fact, ZoomText and JAWS were known to run smoothly on the standard computer build that the Department of State issued to its employees, including Qashu. *Id.* at 33:7–34:16, JA156. And other Department employees with limited vision used assistive software on the standard build without issue. *Id.* at 158:4–6, JA167. As with any software, however, if a user attempts to run several different resource-intensive applications simultaneously, it can affect the computer's performance, *id.* at 37:4–38:20, JA157; *id.* at 158:10–16, JA167.

Whatever the underlying cause, McCarthy and his colleague Scott Duncan promptly responded to Qashu's reported computer issues and were able to troubleshoot them on a case-by-case basis; but when issues kept recurring, in May 2016 (about three months after Qashu's start date), the Department of State acquired and provided to Qashu a new desktop computer with higher specifications than those generally issued

to other State Department employees. *Id.* at 248:5–253:1, 253:11–256:21, JA171–73; *see also id.* at 40:7–41:13, JA157. Notably, Qashu at all times had access to her separate laptop computer, which was loaded with ZoomText and JAWS, and with which Qashu reports no technical issues. Email from McCarthy (Dec. 16, 2015), JA183. List of Assistive Techs. for Qashu (Feb. 10, 2016), JA189.

Many months after her desktop was replaced in May 2016, Qashu reported issues with her replacement desktop that she said began around October 2016. Email from Qashu (Nov. 16, 2016), JA465. The nature of these issues is largely unspecified, but they apparently included what Qashu referred to as a "grinding" sound coming from the computer on November 4, 2016. *Id.*, JA465. The Department of State's information technology staff promptly arranged to try to resolve these issues while Qashu was travelling for work, first to the Cayman Islands starting on November 4 and then to Virginia. *Id.*, JA465; *see also* Email from Qashu (Nov. 22, 2016), JA511 (describing Qashu's November travels). When Qashu returned to the office on Monday, November 14, however, she reported that her computer still had issues, including "small print boxes," "no login," and that it was "asking [her] all kinds of questions [she] could

not read." Email from Qashu (Nov. 16, 2016), JA465. Two days later, on

Wednesday, November 16, the information-technology staff swapped out

the fan in the desktop, which Qashu said allowed her to use the computer.

Email from Qashu (Nov. 16, 2016), JA463.[1]

## III.  Qashu's Work on the Ocean-Acidification Portfolio

Qashu's work for the Department of State involved a diverse array

of ocean-related issues. Among other things, she led the Office's efforts to

coordinate activities on the Aquatic Nuisance Species Task Force, served

as a point of contact regarding the United Nations World Ocean

---

[1]    Qashu's brief says that for an "entire nine months" Qashu could not "attach documents to emails," "listen to JAWS," or "consistently read the font on her computer." Qashu Brief at 8. The record does not support that statement. The cited declaration by Qashu only vaguely states that Qashu's computer would "often" crash when she tried to attach certain kinds of file types to emails, Qashu Aff. ¶ 11, JA272, and that she could not read fonts on unspecified occasions when "the adaptive software did not sync with the older model computer" (which was replaced within a few months of Qashu's arrival) and later when "the fan failed" (which was resolved within a matter of days most of which Qashu was travelling), *id.* ¶ 17, JA260. None of the materials Qashu cites specifically mentions JAWS, and those materials certainly do not establish an unqualified inability to use JAWS for nine full months. To the contrary, Qashu says in a sworn statement elsewhere that throughout her time at the Department of State she wore headphones "all day" because she was actively using JAWS. Qashu Decl. ¶ 19. JA273.

Assessment, and provided technical expertise on the Arctic National Strategy. Performance Plan & Appraisal (Feb. 7, 2017), JA520–21.

About two months into her fellowship, Qashu also began assisting a colleague named Luis Estevez Salmeron in the Office of Marine Conservation on a portfolio of work regarding ocean acidification. Qashu Rog. Resps., No. 10, JA290. Salmeron had served as the "lead" on the portfolio, but he planned to resign his employment at the end of 2016. Voltmer Aff. ¶ 56, JA201.

Voltmer called a meeting with Salmeron and Qashu to decide how to staff the portfolio following Salmeron's departure. During the meeting, Salmeron recommended that Qashu "continue" her work on the portfolio, Qashu Rog. Resps., No. 10, JA290, but neither Qashu nor Salmeron suggested "transferring" Salmeron's responsibilities to Qashu as the sole "lead," "including in response to [Voltmer's] direct question," Voltmer Aff. ¶ 56, JA201; *see also* Schwier Dep. 169:15–170:1, JA215. Voltmer therefore did not provide any recommendation on how to staff the portfolio to Bloom, and Bloom elected to assign a different fellow named Elizabeth Boeck to work on ocean acidification starting in October 2016. Voltmer Aff. ¶ 56, JA201; Am. Compl. ¶ 99, JA25.

Qashu, however, continued to work on the ocean-acidification portfolio for the remaining few months of her fellowship. Schwier Dep. 170:15–172:20, JA215; *see also* Email from Qashu (Jan. 12, 2017) (showing Qashu communicating with outside organizations about ocean acidification issues). Indeed, other than unsupported characterizations, Qashu does not identify any specific way in which her ocean-acidification duties substantively changed after Boeck's assignment in place of Salmeron. Qashu notes that Boeck was designated as the "point of contact" to speak about the portfolio at weekly staff meetings and external working groups, Qashu Rog. Resps., No. 10, JA291, but she does not state that she held that responsibility when she was working with Salmeron. And, again, Qashu never asked that those duties be transferred to her after Salmeron's departure. Voltmer Aff. ¶ 56, JA201.

Qashu identifies only one specific ocean-acidification event in which she was prohibited from participating. Qashu apparently became very upset when the Department of State declined to fund her travel to an ocean-acidification conference that took place in San Diego in December 2016. Voltmer Aff. ¶¶ 56, 61, JA201–02. Voltmer had suggested to Boeck that Qashu could accompany Boeck on that trip and that Qashu's

"expertise . . . would help all involved." *Id.* ¶ 56, JA201. But Boeck informed Voltmer that she "did not need or want assistance." *Id.*, JA201. And Voltmer was unable to fund the trip as a development opportunity for Qashu because of a restriction at the time on anything other than "mission-critical" travel. *Id.*, JA201.

Qashu does not detail any other specific duty or event related to ocean acidification where she was not able to assume the role she desired.

## IV.   <u>The Nonrenewal of Qashu's Fellowship</u>

Qashu's fellowship in the Office of Ocean and Polar Affairs was to last twelve months with the possibility of renewal for another twelve months. Letter from Robinson (May 22, 2015), JA42.

On March 25, 2016, Sohier informed AAAS that the Office of Ocean and Polar Affairs wanted to renew Qashu's fellowship for a second year. Renewal Submission (Mar. 25, 2016), JA225; Sohier Dep. 102:17–103:21, JA237. In June 2016, the director of AAAS, Cynthia Robinson, notified Qashu that her fellowship had been renewed in the Office of Ocean and Polar Affairs. Letter from Robinson (June 3, 2016), JA226; *see also* Email from Kalyandurg (June 3, 2015), JA483. To accept the second followship year, Qashu needed only to renewal her AAAS membership and sign and

return both Robinson's letter and a separate agreement to the terms of the fellowship within one week. Letter from Robinson (June 3, 2016), JA227.

On June 3, 2016, Qashu met with AAAS staff members Rick Kempinski and Chitra Kalyandurg and said she wanted to work in a different office under a different supervisor. Qashu Dep. 257:12–259:3, JA61–63; Email from Robinson (July 27, 2016), JA454 (recounting the date of the meeting). Qashu claims that Kempinski and Kalyandurg agreed to "work on" her request. Qashu Dep. 258:11–12, JA62. On June 7, Qashu notified Kempinski and Kalyandurg by email that she had renewed her AAAS membership and could come sign the paperwork, but that she was going to be out of the office from June 9 to June 15. Email from Qashu (June 7, 2016), JA449–50. Kempinski responded that AAAS was still "discussing with the [Office of the Science and Technology Advisor at the Department of State] what your original agreement was" and that the paperwork could wait until Qashu returned to the office. Email from Kempinski (June 8, 2016), JA449.

On June 9, 2016, Genya Dana from the Office of the Science and Technology Advisor emailed Qashu requesting to discuss Qashu's

"concerns about renewing for a second year." Email from Dana (June 9, 2016), JA230. Qashu wrote back nearly a month later, on July 7, and said that she would not sign the renewal paperwork because it characterized Sohier as her "mentor"; Qashu considered an official in the Office of Marine Conservation to be her mentor. Email from Qashu (July 7, 2016), JA229. After checking with AAAS, Dana assured Qashu that they could call Sohier her "point of contact" instead of her "mentor." Email from Dana (July 12, 2016), JA229.

Over a week later, Qashu had not responded to Dana, and Robinson wrote to Qashu that renewing her fellowship was no longer an option. Letter from Robinson (July 19, 2015), JA231; Email from Qashu (July 20, 2016), JA229. The letter noted that the deadline for submitting the renewal paperwork "passed more than a month ago." *Id.* The letter also explained that, based on discussions with Qashu and the "host office," "the match of [Qashu's] skills and interests to the focus and needs of the office is not aligned" and that Qashu's "request to change offices and mentors is not approved." *Id.*, JA231. To move from the Office of Ocean and Polar Affairs to another office, Qashu would instead have had to

reenter the applicant pool and been selected for placement in a different office. Schwier Dep. 72:19–74:14, JA213–14.

On July 26, Qashu sent Robinson the signed renewal paperwork and asked that Robinson's July 19 letter be "reworded or rescinded." Email from Qashu (July 26, 2016), JA455. Robinson responded by again explaining that Qashu's "desire to work with different staff, offices, and on different projects cannot be accommodated" and that Qashu had failed to submit the completed paperwork agreeing to continue her placement in the Office of Ocean and Polar Affairs until after Qashu received the July 19 letter. Email from Robinson (July 27, 2015), JA454–55.

## V.    Procedural History

On August 1, 2016, Qashu began the process of filing a complaint of discrimination against the Department of State by meeting with an EEO counselor. Counselor's Rep. (Sept. 15, 2016), JA457. As relief, she asked that her fellowship be renewed for a second year and that she be allowed to serve it in another office. *Id.*, JA459. She did not mention any problem with her accommodations during that initial meeting with a counselor. *See id.*, JA459.

- 17 -

After filing a formal complaint and amending it to include, among other things, a failure to accommodate claim, Qashu pursued her claims before the Equal Opportunity Employment Commission. *See Pamala L. v. Blinken*, No. 2020003330, 2021 WL 3804063 (E.E.O.C. July 29, 2021). On July 29, 2021, the Commission upheld a decision by an administrative judge in favor of the Department of State. *Id.* at *2. The administrative judge had concluded that the Department provided Qashu with "numerous accommodations" that she had not shown to be ineffective. *Id.* The administrative judge also rejected a claim by Qashu that she had been denied travel and training opportunities, noting that she had been assigned to travel four times over the course of her one-year fellowship and was provided trainings about every other month. *Id.* The administrative judge also sided with the government on a claim by Qashu that she was not permitted to participate in the performance appraisal process, noting that she participated in the process to the same degree as other employees and received an annual performance evaluation at the conclusion of her fellowship. *Id.* Finally, the administrative judge concluded that Qashu had not shown that the nonrenewal of Qashu's fellowship "was motivated by discriminatory or retaliatory animus." *Id.*

- 18 -

The Commission saw no error in these findings. *Id.* On January 18, 2022, the Commission denied a request by Qashu that the Commission reconsider its order. *Pamela L. v. Blinken*, No. 2020003330, 2022 WL 357259 (E.E.O.C. Jan. 18, 2022).

Qashu brought this civil action pro se on April 18, 2022 (R.1). After obtaining counsel, she filed an amended complaint on October 13, 2022 (R.18). It has three counts: Count I alleges disability discrimination with respect to what Qashu calls a "demotion" and the nonrenewal of her fellowship. Am. Compl. ¶¶ 107–14, JA26–28. Count II alleges failure to accommodate. *Id.* ¶¶ 115–19, JA28–29. And Count III alleges retaliation for protected activity with respect to the "demotion" and the nonrenewal. *Id.* ¶¶ 120–25, JA29–30. After about six months of discovery, *see* Docket, JA5–6, the government moved for summary judgment (R.33), and Qashu cross-moved for partial summary judgment (R.35).

The district court granted the government's motion and denied Qashu's. Regarding Qashu's disability-discrimination claim, the district court concluded that the alleged change to Qashu's ocean-acidification duties and an alleged related directive not to speak without permission in certain meetings were "not actionable" because those functions were

not identifiable "terms, conditions, or privileges" of Qashu's employment, Mem. Op., JA558–60, 560–62, and, independently, because Qashu failed to offer evidence that her duties were changed because of her disability, *id.*, JA560–61. The district court also concluded that Qashu failed to proffer sufficient evidence that her fellowship was not renewed for discriminatory reasons. *Id.*, JA562–65.

As for the failure-to-accommodate claim, the district court concluded that the Department of State provided Qashu with the accommodations that she requested and that her alleged computer problems and a delay in providing her a quieter office did not rise to the level of depriving her of an accommodation. Mem. Op., JA656–69.

Finally, the district court granted summary judgment to the government on Qashu's retaliation claim for largely the same reasons that it did so on Qashu's discrimination claim. Mem. Op., JA569–71

This appeal followed.

## SUMMARY OF THE ARGUMENT

Qashu's failure-to-accommodate claim fails. The Department of State contacted Qashu before her start date to discuss possible accommodations and provided Qashu with every accommodation she

requested. Using those accommodations, Qashu was able to successfully perform her fundamental job duties.

Qashu's various complaints about certain of her accommodations do not give rise to an unlawful failure to accommodate by the Department of State. Most significantly, Qashu complains that her desktop computer, which had some assistive software programs installed, sometimes required a restart or "blacked out." But Qashu fails to show that these computer problems prevented her from performing her fundamental duties. Moreover, the Department of State addressed and resolved the technical issues with Qashu's desktop as they arose, eventually replacing her desktop with a higher-specification model than is provided to other Department of State employees. Indeed, even during the time period that Qashu's brief claims that she was not accommodated, Qashu admitted exactly the opposite to her supervisor, assuring her that she was fully accommodated and that she did not require any additional support in terms of accommodations.

Qashu's other complaints about her accommodations also do not amount to a failure to accommodate. She complains that electronic meeting notifications did not "pop up" on her desktop screen but fails to

explain how this prevented her from performing her duties or from ensuring her timely attendance at meetings by simply monitoring the time without the added convenience of a pop-up notification. She also complains that she could not see the digital, low-contrast displays on certain office equipment like copiers and fax machines, but she fails to explain how this stymied her ability to perform her duties. And she neglects that to mention that the handheld magnification device the Department gave her permitted her to alter the displayed contrast, and she never asked for additional accommodations. Finally, Qashu complains that she had to reserve readers rather than have them at her immediate beck and call, but she identifies no occasion on which she required a reader but was unable to timely secure one's assistance.

Qashu's discrimination and retaliation claims also fail. Qashu first claims that the Department of State discriminated against her because of her disability and retaliated against her for requesting accommodations when it assigned Boeck to work on the ocean-acidification portfolio, rather than spontaneously allow Qashu to assume the sole lead role. For starters, the Department of State's assignment of Boeck to work on ocean acidification is not actionable because Qashu

cannot show that she suffered the requisite harm to a term of her employment as a result. Neither can Qashu show that assigning Boeck to the ocean-acidification portfolio was motivated by discrimination or retaliation against Qashu. Neither Qashu nor anyone else suggested that Qashu should be the sole lead assigned to the portfolio, and Qashu fails to show that reason to be pretext.

Qashu also claims that the Department of State discriminated against her because of her disability and retaliated against her for filing an EEO complaint when it declined to renew her fellowship for a second year. But the record shows that the Department of State did offer to renew Qashu's fellowship with the Office of Ocean and Polar Affairs, and it was Qashu who declined to timely accept that renewal and instead requested to transfer to a different office. Because that request was not approved, and Qashu did not timely accept a renewal with the Office of Ocean and Polar Affairs, her fellowship was not renewed. Again, Qashu fails to show that reason to be pretext.

## STANDARD OF REVIEW

The Court reviews the grant of summary judgment de novo, construing the facts "in the light most favorable" to the nonmovant and

giving her "the benefit of all reasonable inferences." *Ramos v. Garland*, 77 F.4th 932, 934 (D.C. Cir. 2023). Summary judgment "shall" be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

### I. The Department of State Satisfied Its Obligation to Accommodate Qashu's Impaired Vision.

The Rehabilitation Act of 1973, by incorporating the standards of the Americans with Disabilities Act ("ADA"), prohibits disability discrimination by federal employers. *See* 29 U.S.C. §§ 791(f);[2] 794a(a)(1); *Taylor v. Rice*, 451 F.3d 898, 904–05 (D.C. Cir. 2006). One form of prohibited disability discrimination is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the

---

[2]    Qashu's brief cites 29 U.S.C. § 794 as the source of the prohibition on disability discrimination by federal employers. Qashu Brief at 21. But this Court has held that federal employees may bring disability discrimination claims only under § 791, not § 794. *See Taylor v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003) (referring to § 791 as "§ 501" and § 794 as "§ 504"). The distinction is immaterial for present purposes, however, because both sections incorporate the same substantive standards from the ADA to determine whether they have been violated. *Compare* 29 U.S.C. § 791(f), *with id.* § 794(d).

accommodation would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). To prevail on a discrimination claim based on a failure to accommodate, an employee "must allege and prove that: (1) [she] is disabled, (2) [her] employer had notice of the disability, and (3) the employer denied [her] request for a reasonable accommodation." *Ali v. Regan*, 111 F.4th 1264, 1268–69 (D.C. Cir. 2024) (citing *Stewart v. St. Elizabeth's Hosp.*, 589 F.3d 1305, 1307–08 (D.C. Cir. 2010)). The first two elements are not disputed here, leaving only the question of whether the Department of State denied a request by Qashu for a reasonable accommodation.

Reasonable accommodations include "[m]odifications or adjustments to the work environment . . . that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The "essential functions" of a position are the "fundamental job duties" of the position; they do not include "marginal functions." *Id.* § 1630.2(n)(1). For example, a function may be essential because "the reason the position exists is to perform that function" or because it is "highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the

particular function." *Id.* § 1630.2(n)(2)(i), (iii). The types of modifications and adjustments that might allow an employee to perform essential functions could be things like "acquisition or modification of equipment or devices . . . the provision of qualified readers or interpreters, and other similar accommodations." 42 U.S.C. § 12111(9).

"An employer fully satisfies its statutory obligation by offering an accommodation that is reasonable, even if it is not the one preferred by the employee." *Ali*, 111 F.4th at 1269 (citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998)); *see also Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015) ("[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee."). In addition, when selecting among reasonable accommodations, while "the preference of the individual with a disability should be given primary consideration," "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § 1630 app.

In selecting an appropriate accommodation, the employee and employer will "frequently need to share information" in what is referred to as an "interactive process." *Ali*, F.4th at 1269 (citing *Ward v. McDonald*, 762 F.3d 24, (D.C. Cir. 2014)); 29 C.F.R. § 1630.2(o)(3) (providing that employers and employees may need to engage in "an informal, interactive process . . . [to] identify . . . the potential reasonable accommodations"). Neither party may "cause a breakdown in the [interactive] process for the purpose of either avoiding or inflicting liability." *Ward*, 762 F.3d at 32. Thus, "if an employee withholds requested information that is relevant to determining the existence of a disability or the appropriate accommodation for it, that employee may bear responsibility for the breakdown of the interactive process, which would foreclose a failure-to-accommodate claim." *Ali*, 111 F.4th at 1270.

"The interactive process, though, 'is not an end in itself.'" *Ali*, 111 F.4th at 1270 (quoting *Wilson v. Dollar Gen Corp.*, 717 F.3d 337, 347 (4th Cir. 2013), in turn quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000)). For that reason, "it is not sufficient" for an employee to show that her employer "failed to engage in the interactive process or that it caused the interactive process to break down"; rather,

she must show "that the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Rehling*, 207 F.3d at 1015–16.

### A. The Department of State Provided Qashu with Multiple Reasonable Accommodations.

Recognizing that Qashu required accommodations for her vision loss, the Department of State provided her an array of assistive devices and technologies. McCarthy communicated extensively with Qashu before her start date to determine which accommodations would allow her to perform her duties, and no accommodation requested by Qashu was refused. Emails from McCarthy & Qashu (July to Dec. 2015), JA178–82, 183–84; McCarthy Dep. 97:5–99:15, JA163. The accommodations included: (1) the Pearl camera for magnifying written materials; (2) the Ruby handheld magnifier; (3) JAWS; (4) ZoomText; (5) the laptop with ZoomText and JAWS installed; (6) the large-screen iPhone with an external keyboard; (7) the extra-large monitor and monitor arm; (8) the Opaltec closed-circuit camera, also for magnifying written materials; (9) the large-print keyboard; (10) Bose noise-cancelling headphones, to better hear screen-reading software; and (11) individual readers whom Qashu could reserve to read materials aloud to her. Email from McCarthy

(Dec. 17, 2015), JA183; List of Assistive Techs. for Qashu (Feb. 10, 2016), JA188; McCarthy Dep. 197:10–20, JA170.

Prior to her start date, Qashu informed the Department of State that the accommodations it had arranged for her were "wonderful" and did not request anything additional. Email from Qashu (Dec. 17, 2015). And about half-way through her fellowship, when specifically asked by Voltmer in the context of discussing accommodations whether "there is some support you need from this office that you're not getting," Email from Voltmer (Sept. 22, 2016), JA195, Qashu responded in the negative and proclaimed the accommodations office to be "stupendous." Email from Qashu (Sept. 23, 2015), JA195. Days later, she assured the accommodations office that it had been "COMPLETELY" and "BEAUTIFULLY" accommodating, thanking them for all their assistance. Email from Qashu (Sept. 26, 2015), JA196.

There can be no doubt that Qashu was fully able to perform the "fundamental job duties" of her fellowship with the many accommodations provided to her. 29 C.F.R. § 1630.2(n)(1) According to Qashu's job description, those duties included "provid[ing] scientific advice," "promot[ing] U.S. policy and ocean conservation," and

"identify[ing] and advanc[ing] opportunities for scientific collaboration" on ocean issues. Performance Plan & Appraisal (Feb. 7, 2017), JA519. Qashu's performance appraisal reflects that she fulfilled these fundamental duties with marked success. *Id.*, JA523. Over the course of the year, she worked to plan and hold a well-received conference on ocean acidification in Helsinki, Finland. *Id.*, JA524. She helped develop a call for proposals to combat ocean acidification, evaluated those proposals, and selected projects that "were one of the major U.S. deliverables at the 2016 Our Ocean Conference," which "went very smoothly, due to [Qashu's] hard work." *Id.*, JA524. She helped develop a toolkit to improve coverage of the Global Ocean Acidification Network in less-developed areas of the world. *Id.*, JA524. She served on the Aquatic Nuisance Species Task Force, where she "made a number of suggestions that resulted in strategic changes" to the taskforce's management plan. *Id.*, JA524. She advised on the Conservation of Arctic Flora and Fauna Action and Strategy Plan, participated in relevant meetings, and collaborated with the Invasive Species Advisory Council. *Id.*, JA524. She wrote and reviewed projects and grants related to invasive species. *Id.*, JA524. She "served as a science advisor" to a team representing the United States at

the World Ocean Assessment. *Id.*, JA524. And, throughout her fellowship, she successfully worked with partners inside and outside the Department "to provide technical guidance on a wide range of ocean issues, including marine debris and pollution, Arctic invasive species, and other ocean conservation issues." *Id.*, JA524. Qashu's performance appraisal does not identify any duty that she failed to successfully complete over the course of her one-year fellowship.

Qashu's brief does not demonstrate any way in which Qashu was unable to meaningfully perform her fundamental duties in the areas of providing scientific advice, promoting the government's policies, and fostering scientific collaboration. *See* Performance Plan & Appraisal (Feb. 7, 2017), JA524. Instead, Qashu attempts to label as "essential functions," individual actions like writing emails, using office equipment, attending some meetings, and completing some trainings. Qashu Brief at 44. But that characterization amounts only to ipse dixit. Qashu does not explain why such actions should be considered "fundamental job duties" rather than "marginal functions." 29 C.F.R. § 1630.2(n)(1). She does not tie actions like sending emails, attending some meetings, and completing some trainings to her "[w]ritten job description[]" or her "employer's

judgment." 29 C.F.R. § 1630.2(n)(3)(i), (ii). In fact, Qashu's job description shows that her fundamental duties were significantly broader, Performance Plan & Appraisal (Feb. 7, 2017), JA519, and her performance evaluation shows that her employer's judgment was that she performed those fundamental duties successfully throughout her fellowship *id.*, JA523–24. Indeed, when complaining of the Department of State's decision to assign Boeck to the ocean-acidification portfolio, Qashu herself touted her "continued ability to perform her . . . essential job duties" through October 2016. Qashu Rog. Resps., No. 2, JA280. Because Qashu cannot explain how her ability to perform her fundamental duties was impacted by the purported problems with her accommodations, her failure-to-accommodate claim fails.

### B. Qashu's Complaints about Her Work Equipment Do Not Establish a Failure to Accommodate.

Rather than establish any overarching inability to perform her fundamental duties, Qashu complains that the Department "failed to engage in a collaborative process" in four areas: (1) ZoomText and JAWS, (2) meeting notification pop-ups, (3) shared office equipment, and (4) readers. Qashu Brief at 43–49. But Qashu fails to explain how her purported difficulties in those four areas rendered her unable to perform

her duties because of her vision Indeed, as the record shows, Qashu's brief overstates the degree to which she experienced problems in the four identified areas. And it understates the degree to which the Department of State readily engaged with her to find solutions.

### 1.     ZoomText and JAWS

Regarding ZoomText and JAWS, Qashu asserts that the Department of State "did not check if her State-provided computer was compatible with Zoomtext and JAWS," and, "[a]s a result," she sometimes experienced problems "reading emails and reviewing and drafting documents" until "nine months into the twelve-month fellowship." Qashu Brief at 45. As an initial matter, Qashu is wrong to assume that whatever issues she had with her desktop computer were the "result" of an inability to run ZoomText and JAWS, *see id.*, because the cause of her desktop issues was never determined, McCarthy Dep. 255:11–256:21, JA173. In fact, the Department of State's standard computer build, which is what was issued to Qashu, was known to be capable of running those programs, *id.* at 33:7–34:16, JA156, and other Department employees with vision loss used assistive software on their standard-issue desktops without a problem, *id.* at 158:4–6, JA167.

In any event, Qashu fails to establish that the issues with her desktop effectively deprived her of an accommodation. She does not explain with any specificity how her desktop issues significantly impaired her ability to carry out her fundamental scientific- and policy-related duties, and her performance evaluation demonstrates that she had no significant problems; she helped plan events, developed work product, and communicated with stakeholders—and earned praise for doing so. Performance Plan & Appraisal (Feb. 7, 2017), JA523–24.

Indeed, despite Qashu's vague reference to "instability, freezing, and black-outs" over the course of nine months, Qashu Supp. Decl. ¶¶ 8–9, JA272, the detailed record reflects relatively minor and intermittent computer problems that did not significantly prevent Qashu from performing her fundamental duties. For the first few months, McCarthy and Duncan were generally able to troubleshoot Qashu's desktop problems on a case-by-case basis, and the Department replaced her computer in May 2016 (about three months into Qashu's fellowship) when those problems continued to recur. McCarthy Dep. 248:5–253:1, 253:19–256:21, JA173–73; *see also id.* at 40:7–41:13, JA157. After the replacement, there is no record of Qashu reporting any specific

significant technology problems arising until October 2016, when she complained of issues including a "grinding" sound, which information-technology staff attempted to address while Qashu was on travel. Email from Qashu (Nov. 16, 2016), JA465. When Qashu identified other problems upon her return to the office on November 14, they were remedied that same day with a replacement of the desktop's fan. Email from Qashu (Nov. 16, 2016), JA463. While Qashu's occasional computer problems may have rendered experience with ZoomText and JAWS sometimes less-than-"perfect," that is not enough to render the many accommodations provided by the Department of State to be unreasonable. *Noll*, 787 F.3d at 95; *see also Aka*, 156 F.3d at 1305.[3]

Moreover, whatever issues Qashu may have had with her desktop, she at all times had access to other means of reading electronic documents, including her fully functioning laptop loaded with ZoomText and JAWS, which had been provided to her as an additional accommodation. Email from McCarthy (Dec. 16, 2015); List of Assistive

---

[3] Qashu says that ZoomText and JAWS did not work at her initial login screen. Qashu Brief at 50. She was nevertheless able to navigate that screen, however, using her Ruby handheld magnifier. Email from Qashu (Feb. 12, 2016), JA516.

Techs. for Qashu (Feb. 10, 2016), JA189. While it is true that the desktop rather than the laptop was generally intended for in-office use, Qashu provides no practical reason why she could not have used her laptop in the office if indeed her desktop were as nonfunctional as her brief claims.

Even assuming Qashu's desktop issues did at some point amount to a deprivation of an accommodation, the Department of State fulfilled its legal obligation to engage in a "good faith" interactive process to resolve those issues. *Ward*, 762 F.3d at 32. Again, McCarthy and Duncan provided troubleshooting on a case-by-case basis and, in May 2016, acquired an upgraded desktop for Qashu. McCarthy Dep. 248:5–253:1, 253:19–256:21, JA173–73; *see also id.* at 40:7–41:13, JA157. The next recorded report of a computer issue by Qashu began in October 2016 and was immediately resolved with a fan replacement. Email from Qashu (Nov. 16, 2016), JA463–65.

Qashu's assertion that she was deprived of a reasonable accommodation because of vaguely described computer issues lasting until November 2016 is disproven by her September 2016 admission to Voltmer that she required no additional support in terms of accommodations and her similar admission to the accommodations office

that it had "COMPLETELY" and "BEAUTIFULLY" accommodated her. Email from Qashu (Sept. 23, 2015), JA195; Email from Qashu (Sept. 26, 2015), JA196. Qashu attempts to downplay the importance of these communications, Qashu Brief at 47, but they are admissions as to the "complete" adequacy of the Department of State's accommodations during the very time that Qashu's brief now claims she could not perform the essential functions of her position due to lack of accommodation.

These admissions also defeat Qashu's argument that the Department of State "did not engage with" her to address her purported accommodation problems. Qashu Brief at 45. To the contrary, Qashu's supervisor proactively asked Qashu in September 2016 whether she required any additional support, and Qashu assured her and the accommodations office that she was "completely" and "beautifully" accommodated. Email from Qashu (Sept. 23, 2015), JA195; Email from Qashu (Sept. 26, 2015), JA196. Assuming Qashu's accommodations truly were ineffective as she now claims, she may not impose liability on the Department by withholding that information from her supervisor when directly asked whether there were other accommodations that she required. *See Ali*, 111 F.4th at 1270.

## 2. Meeting Notification Pop-Ups

Qashu next complains that she had "difficulty attending meetings" because electronic meeting reminders "did not pop-up on [her] screen," which Qashu apparently believes had something to do with ZoomText and JAWS. Qashu Brief at 47; *see also* Supp. Qashu Decl. ¶ 14, JA273.

Again, Qashu does not say that this apparent inconvenience impacted her ability to perform her fundamental duties. And while she cites her own testimony that Sohier was generally aware of her "computer issues," Qashu Brief (citing JA289), she points to no evidence that she specifically reported any issue with her meeting notifications or requested some additional accommodation about being reminded of meetings. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied.").

In any event, staff meetings took place at the same time and location each week, Sohier Dep. 92:21–93:18, JA368–69, and Qashu does not explain why she could not simply ensure her punctual attendance by monitoring the time, without the added reminder of a pop-up notification.

3.    Printers, Copiers, and Fax Machines

Next, Qashu claims that she had "difficulty" using office equipment like printers, copiers, and fax machines because she had trouble reading their digital displays. Qashu Brief at 48.

Again, Qashu offers no evidence of any impact that this difficulty may have had on her ability to perform her fundamental duties. She does not, for example, identify any specific need to use a fax machine to carry out her fundamental duties, nor does she describe any meaningful impact that her purported difficulty with the fax machine had on her performance.

Nor again does Qashu offer evidence that she requested any additional accommodations related to office equipment, only that Sohier and Bloom knew that she would generally use the equipment, Qashu Brief (citing JA373, 393). Absent a requested and denied accommodation, Qashu cannot show the Department's actions to be unlawful. *See Flemmings*, 198 F.3d at 86.

In any event, Qashu received an accommodation that permitted her to read digital displays. She was provided a Ruby handheld magnifier that she could have used to increase the size of the digital screens on

shared office equipment. List of Assistive Techs. for Qashu (Feb. 10, 2016), JA188. Qashu used this device successfully in other contexts, including to type her password into the login screen of her desktop. Email from Qashu (Feb. 12, 2016), JA516. Qashu insists that the Ruby did not alleviate all her difficulties with office equipment because the digital displays were "low contrast." Supp. Qashu Decl. ¶ 17, JA273. But the record shows that the Ruby did not only magnify, it also had a color-filtration function that would alter the contrast of the magnified image. McCarthy Dep. 185:15–187:12, JA169. Qashu nowhere explains why she could not use this feature to overcome any difficulty posed by the low contrast on the digital displays of the shared office equipment.

### 4.    Readers

Finally, Qashu takes issue with the readers that the Department of State made available to her and other employees in need of visual accommodations, complaining that she had to request those readers in advance. Qashu Brief at 49. But Qashu does not explain why she could not take the simple action of providing advance notice when she anticipated the need for a reader. Qashu insists that a request for reader "could" take weeks to fulfill, but she tellingly does not say that she ever

waited that long, *id.*, nor does she identify a single occasion when a reader was not available to timely meet one of her needs.

The only specific complaint by Qashu regarding readers is that the purported lack of a reader once prevented her from completing a training on time. Qashu Brief at 8, 49. That is not what the record shows. In the cited documents, on November 16, Qashu emails McCarthy to say that her desktop is not working, and she requests a reader to assist her in the meantime. Email from Qashu (Nov. 16, 2016), JA465–66. McCarthy immediately responds that day, copying a reader named Crystal Maitland to assist Qashu with scheduling a reader. Email from McCarthy (Nov. 16, 2016), JA464–65. Later that day, Qashu responds that her desktop had been promptly fixed that same day, but that she nevertheless "continue[d] to need reader assistance" for an online course. Email from Qashu (Nov. 16, 2016), JA463. She notes that she had received an extension to complete the course but provides no information about the basis for that extension. *See id.*, JA463. Again, McCarthy responds immediately (still on November 16) to say that a reader will contact Qashu to schedule assistance. Email from McCarthy (Nov. 16, 2016), JA463. These emails reflect only that Qashu requested a reader

on November 16, and McCarthy promptly connected her that same day to a reader for scheduling. McCarthy's immediate responses to Qashu's requests contradict Qashu's untrue assertion that the Department of State "did nothing" to ensure her access to readers. Qashu Brief at 49.

## C.    The Department of State Did Not Unlawfully Delay Qashu's Accommodations.

Unable to show any outright denial of a reasonable accommodation, Qashu tries to claim that the Department of State "unreasonably delayed" providing her with accommodations. Qashu Brief at 49–51. There are indeed "circumstances in which a 'long delayed accommodation could be considered' unreasonable and hence 'actionable under the ADA.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (quoting *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 367 (D.C. Cir. 2007) ("[W]e doubt that a three-year delay in accommodating a plaintiff's disability is not actionable under the ADA.")). But those circumstances are not present here.

First, Qashu claims that there was a "nine-month delay" in the Department of State providing her a functioning computer. Qashu Brief at 50. As demonstrated above, that assertion is contradicted by the record, which shows that Qashu's computer issues were relatively minor

- 42 -

and intermittent, and that McCarthy, Duncan, and the information-technology staff responded promptly to resolve Qashu's issues through troubleshooting, replacing her computer, and swapping out the fan as appropriate. *Supra* at 34–36. And Qashu even admitted during that nine-month period that she was "completely" and "beautifully" accommodated. *Supra* at 36–37. Moreover, despite Qashu's conclusory assertion that she could not "perform the essential functions of her job" for those nine months, Qashu Brief at 50, she offers no specific fundamental duties she could not perform; and her performance evaluation shows that she was productive and successful throughout her one-year fellowship, *supra* at 29–32.

Second, Qashu argues that the Department of State delayed moving her to a quieter office until October 2016. Qashu Brief at 50–51; Qashu Supp. Decl. ¶ 23, JA274. She says that the sounds of nearby office equipment and co-workers socializing were distracting when she was attempting to listen to JAWS. Qashu Aff. ¶ 37, JA266–67.

Qashu fails to show with any detail why a quiet environment was a necessary accommodation. And, even assuming it was, the Department of State at all times provided Qashu with Bose noise-cancelling

headphones that she could use to listen to JAWS without audible distraction. The fact that Qashu may have preferred an office move does not render the noiseless headphones unreasonable. *See Ali*, 111 F.4th at 1269 (citing *Aka*, 156 F.3d at 1305) (employees are entitled to a "reasonable accommodation," not their preferred accommodation).

Notably, Qashu's declarations ignore that she had access to the noise-cancelling headphones and do not assert that they were incapable of achieving their purpose: reducing ambient noise so that she could hear the screen reader. In fact, Qashu elsewhere asserts that she used her noise-cancelling headphones "all day" and that they rendered her oblivious to the sounds of nearby co-workers. Qashu Decl. ¶¶ 18–19. JA273.

## II.    Qashu's Discrimination and Retaliation Claims Fail.

The Rehabilitation Act, by incorporating the standards of the ADA, 29 U.S.C. § 791(f), makes it unlawful for a federal employer to "discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a). It also makes it unlawful for a federal employer to retaliate "against any individual because such individual has opposed any act or

practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.

Qashu claims that the Department of State discriminated and retaliated against her in two respects. First, she claims that, based on her disability and making protected requests for accommodation, the Department of State assigned Boeck to work on the ocean-acidification portfolio and limited her ability to speak on behalf of the Department about ocean-acidification issues. Qashu Brief at 36–41. Second, Qashu claims that, based on her disability and protected activity, her fellowship was not renewed for a second term of twelve additional months. *Id.* at 28–36.

Discrimination and retaliation claims brought under the Rehabilitation Act are analyzed under the three-part burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (discrimination claims); *Doak v. Johnson*, 798 F.3d 1096 (D.C. Cir. 2015) (retaliation claims). Under that framework, the plaintiff must first

establish a prima facie case of discrimination or retaliation. *McDonnell-Douglass*, 411 U.S. at 802. To make out a prima facia case of discrimination, a plaintiff must show that (1) she "suffered an adverse employment action" (2) "because of [her] disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). For a prima facie case of retaliation, a plaintiff must show that (1) "she engaged in a statutorily protected activity," (2) "she suffered a material adverse action by her employer," and (3) "a causal link connects the two." *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014) (cleaned up).

If a plaintiff establishes a prima facia case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory and nonretaliatory reason for the challenged action. *Solomon*, 763 F.3d at 14. If the employer does so, the burden shifts back to the employee to prove that the employer's proffered reason is false and that the real reason for the action was discrimination or retaliation. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). "At the summary judgment stage, once the employer has claimed a nondiscriminatory reason for its actions, this burden-shifting framework disappears" and the only remaining inquiry is "whether a reasonable jury could infer retaliation or discrimination

from all the evidence." *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Qashu fails to show that she suffered an actionable adverse action with respect to the Department's staffing of the ocean-acidification portfolio. And she fails to show either that the staffing of the ocean-acidification portfolio or the nonrenewal of her fellowship were motivated by discrimination or retaliation.

### A.  Qashu's Discrimination and Retaliation Claims Related to the Ocean-Acidification Portfolio Fail.

#### 1.  The Department of State's Staffing of the Portfolio Is Not an Actionable Adverse Action.

Around April 2016, Qashu began assisting Salmeron on the ocean-acidification portfolio. Qashu Rog. Resps., No. 10, JA290. When Salmeron announced that he would be leaving the Department at the end of 2016, Voltmer met with Salmeron and Qashu to discuss how to staff the portfolio following Salmeron's departure. At that meeting, neither Qashu nor Salmeron suggested transferring Salmeron's ocean-acidification responsibilities solely to Qashu, "including in response to [Voltmer's] direct question," Voltmer Aff. ¶ 56, JA201; *see also* Schwier Dep. 169:15–

170:1, JA215. Voltmer therefore did not convey to Bloom any recommendation on how to staff the portfolio after Salmeron's departure, and Bloom assigned Boeck to the portfolio in October 2016, with Qashu continuing to assist with ocean acidification work. Voltmer Aff. ¶ 56, JA201; Am. Compl. ¶ 99, JA25.

The fact that the Department of State did not assign Qashu to be the sole "lead" on the ocean-acidification portfolio is not actionable under the anti-discrimination and anti-retaliation provisions incorporated from the ADA into the Rehabilitation Act. *See* 29 U.S.C. § 791(f). Again, the ADA's antidiscrimination provision says that no employer shall "discriminate against" an individual regarding the "terms, conditions, and privileges of employment." 42. U.S.C. § 12112. The Supreme Court in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), construed similar language in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), to mean that an employee must show "some harm" to an "identifiable term or condition of employment," though the employee need not show that the harm was "significant." *Id.* at 354–55. *Muldrow* effectively displaced the decision rendered en banc by this Court in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022). *See*

*Muldrow*, 601 U.S. at 363-64 (Kavanaugh, J., concurring) (noting that the Supreme Court's standard of "some harm" differs from that described in *Chambers*). The anti-retaliation provision bars "discriminat[ion] against any individual because such individual . . . made a charge . . . under this chapter." 42 U.S.C. § 12203(a). Plaintiffs invoking Title VII's similarly worded retaliation provision, 42 U.S.C. § 2000e-3(a), must show a "materially adverse action" amounting to more than "trivial harms," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This Court has held, for example that a denial of request to transfer to a position overseas was not materially adverse. *Ramos v. Garland*, 77 F.4th 932 (D.C. Cir. 2023) (denial of request to transfer to a position overseas was not materially adverse).

Qashu fails to identify either "harm" to an "identifiable term or condition of employment" or more than "trivial harm." *Muldrow* 601 U.S. at 354–55; *White*, 548 U.S. at 68. Critically, Qashu does not explain with any detail how her ocean acidification duties changed after Boeck's assignment in place of Salmeron, other than her disappointment at not being permitted to attend a conference in San Diego because she was not deemed "mission critical." Voltmer Aff. ¶¶ 56, 61, JA201–02. Qashu does

say that Boeck rather than herself was the "point of contact" to speak about the portfolio at meetings, Qashu Rog. Resps., No. 10, JA291, but Qashu does not state that she held that responsibility under Salmeron. Moreover, Qashu continued to work on the ocean-acidification portfolio for the remaining few months of her fellowship. Schwier Dep. 170:15–172:20, JA215; *see also* Email from Qashu (Jan. 12, 2017) (showing Qashu communicating with outside organizations about ocean acidification issues). Thus, Qashu fails to show how she suffered any harm with respect to her work on the ocean-acidification portfolio.

Notably, Qashu served as the "point of contact" on other important issues, including the United Nations World Ocean Assessment. Performance Plan & Appraisal (Feb. 7, 2017), JA477. Those duties allowed Qashu to engage with the "pool of experts" on the assessment at a meeting of the United Nations in New York and to serve as science advisor to the team representing the United States. *Id.* at 480.

In sum, Qashu fails to show any harm to an identifiable term of her employment with regard to ocean-acidification work, so her discrimination and retaliation claims on that topic were properly decided in favor of the government.

- 50 -

2.     The Department of State's Staffing of the Portfolio Was Not Based on Discrimination or Retaliation.

Even were the Department of State's decision to assign Boeck to the ocean-acidification portfolio actionable, the judgment for the government should nevertheless be affirmed because Qashu fails to show that the decision was based on her disability or her filing of an EEO complaint. Qashu relies on essentially the same arguments to support her claims of discrimination and retaliation, except that for the retaliation claim she also asserts that her meeting with Voltmer about ocean-acidification duties was so close in time after her filing of an informal EEO complaint that it allows an inference of retaliation. Qashu Brief at 53–54. But Qashu does not cite any evidence that Voltmer "had knowledge of" her informal EEO complaint, which would be necessary to support a retaliatory inference. *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012). Moreover, because the Department of State has explained its actions with respect to the ocean-acidification portfolio, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

1.    Attempting to provide such positive evidence, Qashu first argues that she was "substantially more qualified" than Boeck. Qashu Brief at 37–38. This argument is misplaced for two reasons. First, comparing Boeck's and Qashu's qualifications is inapt because this is not a circumstance where the Department of State chose to "promote one employee over another." *Hamilton*, 666 F.3d at 1351. To the contrary, the Department of State was assigning work an employee who had already been hired to a position responsible for performing that type of work. *See* Voltmer Aff. ¶ 56, JA201.

Second, there is no evidence that Bloom's decision to assign Boeck to the ocean-acidification portfolio was based on a comparative weighing of Qashu's and Boeck's qualifications. Because neither Qashu nor Salmeron recommended that Qashu assume the sole "lead" role on the portfolio, Voltmer did not make any recommendation to Bloom as to how the portfolio should be staffed. Voltmer Aff. ¶ 56, JA201. Bloom's decision to assign Boeck to the portfolio therefore did not involve any determination that Boeck's qualifications exceed Qashu's, and Qashu's purportedly superior qualifications therefore do not create an inference

that Bloom acted out of pretext. *Id.*, JA201; *see also* Schwier Dep. 169:15–170:1, JA215.

2.    Next, Qashu argues that the Department of State's explanation about staffing the ocean-acidification portfolio is "flawed" in four ways. Qashu Brief at 39–40. First, she complains that the decision to assign Boeck to the portfolio was not contemporaneously documented. *Id.* at 39. But Qashu does not establish that it would have been typical for the Department to contemporaneously document each and every work assignment, which is a far more workaday employment action than the promotion decision at issue in *Hamilton*, upon which Qashu relies. *Id.* Further, in *Hamilton*, there was limited documentation of the promotion action in the form of interview notes, which did not reflect the reason for the nonpromotion put forward by the agency. 666 F.3d at 1355–56. This case does not present a similar circumstance.

Second, Qashu is wrong that it is not clear who made the decision to promote Boeck. Qashu Brief at 39. Bloom made that decision. Voltmer Aff. ¶ 56, JA201. Contrary to Qashu's brief, Bloom did not testify that he could not remember promoting Boeck; he testified that he did not remember Qashu "being removed from anything." Bloom Dep. 111:8–21,

- 53 -

JA118. That creates no inconsistency because Bloom did not "remove" Qashu from the ocean-acidification portfolio by assigning Boeck to it. In any event, a witness's "failure to recall" an event during a deposition "does not, on its own, create a genuine issue of material fact." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272–73 (D.C. Cir. 2014).

Third, Qashu argues that the Department's explanation is "unworthy of credence" because it is "understandable" that Qashu did not ask to be made the sole lead of the ocean-acidification portfolio. Qashu Brief at 39–40. But regardless of the reasonableness of Qashu's motivation to keep quiet, the fact that she did not request to lead the portfolio and that Salmeron recommended only that she "continue" in her prior role (which was to assist Salmeron), Voltmer Aff. ¶ 56, JA201, makes it entirely credible that Voltmer would have made no recommendation to Bloom and that Bloom would have assigned Boeck to work on the portfolio along with Qashu.

Finally, Qashu points to what she calls "discriminatory statements and actions" by her supervisors. Qashu Brief at 40. Most of those purported statements and actions involve Sohier, who is not alleged to have played any role in assigning Boeck to the ocean-acidification

portfolio. As for Bloom, Qashu complains that he did not look at her when she entered his office and that he asked Qashu not to come to him directly with inter-office conflicts. Qashu Brief at 36. While Qashu may have taken offense at Bloom's actions, they do not support assigning discriminatory animus by Bloom against disabled persons because they carry no "undertones" of hostility to Qashu's disability, *Hairston*, 773 F.3d at 274, and no "code" for disability discrimination, *DeJesus v. WP Co. LLC*, 841 F.3d 527, 536 (D.C. Cir. 2016). And even if they did, they would not show discrimination in the specific decision to assign Boeck to the ocean-acidification portfolio because they would amount only to "isolated . . . remark[s] unrelated to the relevant employment decision," which "could not, without more, permit a jury to infer discrimination." *Morris v. McCarthy*, 825 F.3d 658, 669 (D.C. Cir. 2016).

3.    Qashu also argues that the Department of State did not "attempt to explain why it restricted Qashu's responsibilities to assisting a less-qualified employee." Qashu Brief at 40–41. But she fails to show with any detail that the Department did any such thing. Prior to Boeck's assignment to the ocean-acidification portfolio, Salmeron had been the lead, and Qashu's role had been to "contribute her expertise and support

as appropriate." Voltmer Aff. ¶ 56, JA201. Qashu does not explain in detail how those responsibilities were any more "restricted" following Boeck's assignment, nor does she identify any State Department employee who took the purposeful action of restricting the duties that she previously performed. Instead, the evidence shows that Qashu continued to work on the ocean-acidification portfolio. Schwier Dep. 170:15–172:20, JA215; *see also* Email from Qashu (Jan. 12, 2017) (showing Qashu communicating with outside organizations about ocean acidification issues).

**B.    The Nonrenewal of Qashu's Fellowship Was Not Based on Discrimination or Retaliation.**

The Department of State wanted to renew Qashu's fellowship in the Office of Ocean and Polar Affairs, *see* Renewal Submission (Mar. 25, 2016), JA225; Sohier Dep. 102:17–103:21, JA237, and Qashu was offered the opportunity to serve a second-year fellowship year in that office if only she would timely complete the necessary paperwork, *see* Letter from Robinson (June 3, 2016), JA226; Email from Kalyandurg (June 3, 2015), JA483. Qashu's fellowship was not renewed, however, because Qashu herself declined to timely submit the paperwork necessary to renew her fellowship with the Office of Ocean and Polar Affairs and instead

requested to work in a different office under a different supervisor. Qashu

Dep. 257:12–259:3, JA61–63. Because that request was not approved and

Qashu did not timely accept the offered second-year fellowship in the

Office of Ocean and Polar Affairs, Qashu's fellowship was not renewed.

Letter from Robinson (July 19, 2015), JA231; Email from Robinson (July

27, 2015), JA454–55. Qashu fails to show that this explanation is pretext

for discrimination or retaliation.[4]

1.    First, Qashu accuses the Department and AAAS of offering

"shifting explanations." Qashu Brief at 29–31. To the contrary, the

explanations in the record are not "sufficiently inconsistent as to be

'probative of pretext.'" *Oviedo v. WMATA*, 948 F.3d 386, 398 (D.C. Cir.

2020) (quoting *Galeta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)).

In her attempt to paint a picture of inconsistency, Qashu obfuscates

the reasons given in AAAS's letter informing her of the nonrenewal.

Qashu Brief at 29. It was not only that Qashu had not timely submitted

her renewal paperwork to timely renew with the Office of Ocean and

Polar Affairs; it was that she instead requested to "change offices," which

---

[4]    Again, Qashu relies on the same arguments to show both
discrimination and retaliation. Qashu Brief at 53–54.

was "not approved." Letter from Robinson (July 19, 2016), JA231. The fact that Qashu claimed to have "signed her paperwork on time" (Qashu Brief at 29) was of no effect because it was obviously not enough for Qashu to have signed and retained her paperwork; she had to "return all of" the paperwork to AAAS for the renewal to be effective. Letter from Robinson (June 3, 2016), JA227. That was the primary point of Robinson's message to Qashu, Email from Robinson (July 27, 2016), JA454 ("Full documentation was never submitted to AAAS."); not merely that Qashu had not signed her "initials in the right places," Qashu Brief at 29.

Contrary to Qashu's assertion, none of this is "inconsistent" with the deposition testimony of Allison Schwier, who said that it was "unclear" to her whether Qashu had completed her renewal paperwork for the Office of Ocean and Polar Affairs, but aknowledged that Qashu had "tried to change her designated mentor and office to [the Office of Marine Conservation]." Schwier Dep. 101:1–8, JA346. Nor is it inconsistent with AAAS's assessment that Qashu's interests and the needs of the Office of Ocean and Polar Affairs were "not aligned." Letter from Robinson (July 19, 2016), JA231. Indeed, that assessment is

reflective of that fact that Qashu declined to timely accept a renewed fellowship in the Office of Ocean and Polar Affairs while requesting to transfer to a different office, even while Sohier and Bloom themselves thought Qashu was a good fit to continue with their office. Sohier Dep. 113:9–12, JA377; Bloom Dep. 100:10–20, JA394. These reasons are reiterated—not contradicted—in the State Department's discovery response that Qashu's fellowship was not renewed because her "request for a new supervisor and office could not be accommodated" and she "had been unable to timely commit to remaining with her office and supervisor for her second year." Dep't of State Rog. Resps., No. 12, JA428.

Similarly, Qashu is wrong that the Department of State has offered "different views" on who made the decision not to renew Qashu's fellowship. Qashu Brief at 34–35. The primary decisionmaker was Qashu, who made the choice not to timely accept the offer of a renewed fellowship with the Office of Ocean and Polar Affairs and to instead request a transfer to a different office. And it was AAAS and the Department of State's Office of the Science and Technology Advisor to the Secretary, where Genya Dana served as the fellowship coordinator, that decided that Qashu's request to move to a new office would not be

- 59 -

approved and that her fellowship would not be renewed. Dep't of State Rog. Resps. Nos. 12–13, JA428–29.

2.    Qashu next asserts that the Department of State's reasons for not renewing her fellowship are "provably false." Qashu Brief at 31–33. To show pretext, however, it is not enough for Qashu to question the "correctness" of the reasons given to her, she must show that the Department of State did not "honestly believe" the reasons it offered. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996). She cannot show that here.

Qashu's argument again distorts the real reasons that her fellowship was not renewed. While Qashu may have had signed paperwork in hand when she met with AAAS representatives on June 3, 2016, there is no dispute that she declined at that time to accept a renewed fellowship with the Office of Ocean and Polar Affairs. Qashu Dep. 257:12–259:3, JA61–63 There is therefore no reason to doubt that the Department of State "honestly believed" that Qashu declined to timely accept the offer of a renewed fellowship in the Office of Ocean and Polar Affairs and instead requested to transfer to a different office under a different supervisor. *See Fischbach*, 86 F.3d at 1183.

Qashu's brief says that she "called and emailed" and "offered several times" to come to the AAAS office and sign the renewal paperwork. Qashu Brief at 32. But the cited deposition testimony makes clear that Qashu was not calling about signing the paperwork to renew with the Office of Ocean and Polar Affairs, she was calling about "the office change" that she had requested, Qashu Dep. 260:18–22, JA64, and which was ultimately "not approved," Letter from Robinson (July 19, 2015), JA231. Qashu cannot show that at any point before Robinson informed Qashu that her fellowship was not renewed that she had attempted to submit paperwork to accept the offered renewal with the Office of Ocean and Polar Affairs. There is therefore no reason to doubt the sincerity of that basis for the nonrenewal of Qashu's fellowship.

3.     Next Qashu argues that the reason for the nonrenewal set forth in the AAAS letter is suspiciously "subjective." Qashu Brief at 33–34. Qashu notes that the AAAS letter described her as not "fit" for the Office of Ocean and Polar Affairs, even though Sohier and Bloom were willing to renew her fellowship. *Id.* (citing JA377, 396). As an initial matter, the specific language in the AAAS letter was drafted by Robinson, who is a representative of AAAS and not the Department of State. So the

use of purportedly "subjective" explanations does not reflect pretext on the part of the Department of State. In any event, Qashu ignores a critical detail: she herself declined to timely accept the offer to renew her fellowship with the Office of Ocean and Polar Affairs and requested to transfer to a different office. That is the reason for the nonrenewal of Qashu's fellowship, and there is nothing suspiciously "subjective" about it.

4.    Finally, Qashu argues that alleged "discriminatory statements" by Sohier and Bloom indicate that her disability was the reason for not renewing her fellowship. Qashu Brief at 35–36. But Qashu ignores that Sohier and Bloom are not the individuals who decided not to renew Qashu's fellowship; to the contrary, they supported renewing Qashu's fellowship with the Office of Ocean and Polar Affairs. *See* Renewal Submission (Mar. 25, 2016); Sohier Dep. 102:17–103:21, JA237; Bloom Dep. 103:16–104:15, JA396. It was instead "mutually decided" by AAAS and the Office of the Science and Technology Advisor to the Secretary that Qashu's request to move to a new office would not be approved and that her fellowship would not be renewed. Dep't of State Rog. Resps. Nos. 12–13, JA428–29. Qashu provides no reason to believe

that the decision makers in those offices were motivated by discrimination or retaliation.

Furthermore, the statements and actions identified by Qashu are not indicative of discriminatory animus on the part of Sohier and Bloom. Qashu alleges that Sohier commented that an office intern helping her with a computer issue had other "work to do" and that Bloom did not turn toward Qashu when she entered his office and once asked her not to bring nonpolicy issues directly to him. Qashu Brief at 35–36 (citing Qashu Aff. ¶¶ 7, 18–19, JA255, 260–61). She also accuses Sohier of some odd behavior. She claims to have visibly witnessed him "making pelvic movements constantly" whenever she was in his office. Qashu Aff. ¶ 19, JA261; *see also* Qashu Brief at 35; Qashu Dep. 267:2–268:7, JA71–72.

None of these statements and actions have any obvious connection to Qashu's disability and therefore do not show "bias against a protected class in the employment decision." *Oviedo*, 948 F.3d at 394 (D.C. Cir. 2020) (alterations in original) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013)). They do not contain discriminatory "undertones," *Hairston*, 773 F.3d at 274, or "code," *DeJesus*, 841 F.3d at 536. And even if they could be somehow connected to Qashu's disability,

they would amount only to "isolated . . . remark[s] unrelated to the relevant employment decision," which "could not, without more, permit a jury to infer discrimination." *Morris*, 825 F.3d at 669.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

JANE M. LYONS
Assistant United States Attorney

*/s/ Johnny Walker*
JOHNNY H. WALKER
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
(202) 252-2511

*Attorneys for the United States of America*

February 27, 2025

- 64 -

## CERTIFICATE OF COMPLIANCE
(Fed. R. App. P. 32(a)(7)(B))

This brief is prepared using 14-point Century Schoolbook, a proportionally spaced font and—omitting those items described in Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1)—contains 12,328 words as counted by Microsoft Word 365.

*/s/ Johnny Walker*
JOHNNY H. WALKER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on February 27, 2025, I caused a true and correct copy of the above brief to be served upon all counsel of record by filing the brief using the Court's ECF system.

*/s/ Johnny Walker*
JOHNNY H. WALKER
Assistant United States Attorney

# STATUTORY AND REGULATORY ADDENDUM

## 29 U.S.C. § 791(f)

**Standards used in determining violation of section.**

The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201–12204 and 12210), as such sections relate to employment.

## 29 U.S.C. § 794a(a)(1)

The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e–5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e–5(e)(3)) to claims of discrimination in compensation), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

- B -

## 42 U.S.C. § 12111(9)

**Reasonable accommodation**
The term "reasonable accommodation" may include—

**(A)** making king existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

**(B)** job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

## 42 U.S.C. § 12112

**(a) General rule**
No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

**(b) Construction**
As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

\*     \*     \*

**(5)**

**(A)** not making reasonable accommodations to the known physical or mental limitations

- C -

of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

\*      \*      \*

## 42 U.S.C. § 12203(a)

### Retaliation

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

## 29 C.F.R. § 1630.2

### Definitions

\*      \*      \*

**(n)** *Essential functions*—**(1)** *In general.* The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include the marginal functions of the position.

**(2)** A job function may be considered essential for any of several reasons, including but not limited to the following:

- D -

**(i)** The function may be essential because the reason the position exists is to perform that function;

**(ii)** The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

**(iii)** The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

**(3)** Evidence of whether a particular function is essential includes, but is not limited to:

**(i)** The employer's judgment as to which functions are essential;

**(ii)** Written job descriptions prepared before advertising or interviewing applicants for the job;

**(iii)** The amount of time spent on the job performing the function;

**(iv)** The consequences of not requiring the incumbent to perform the function;

**(v)** The terms of a collective bargaining agreement;

**(vi)** The work experience of past incumbents in the job; and/or

**(vii)** The current work experience of incumbents in similar jobs.

- E -

**(o)** *Reasonable accommodation.*

**(1)** The term reasonable accommodation means:

**(i)** Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

**(ii)** Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

**(iii)** Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

**(2)** *Reasonable accommodation* may include but is not limited to:

**(i)** Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

**(ii)** Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate

- F -

adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

**(3)** To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

**(4)** A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (paragraph (g)(1)(i) of this section), or "record of" prong (paragraph (g)(1)(ii) of this section), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this section).

*    *    *