**Not yet scheduled for oral argument**
**No. 24-5201**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Susan Qashu,

Plaintiff-Appellant,

v.

Marco Rubio,

Defendant-Appellee.

---

On Appeal from a Final Judgment of the
United States District Court for the District of Columbia
Case No. 1:22-cv-01077, Judge Trevor N. McFadden

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT SUSAN QASHU

---

Madeleine Gates
WASHINGTON LAWYERS COMMITTEE FOR
  CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
(202) 319-1010

Sara Brizio
Shreya Sarin
Grace Seifert
  Student Counsel

Regina Wang
Brian Wolfman
Becca Steinberg
GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC
600 New Jersey Ave. NW,
  Suite 312
Washington, D.C. 20001
(202) 661-6741

Counsel for Appellant Susan Qashu

April 15, 2025

**Table of Contents**

Table of Authorities ............................................................................. iii

Glossary ............................................................................................. vi

Introduction and Summary of Argument ............................................... 1

Argument ............................................................................................ 2

I.   Qashu established disparate-treatment disability-discrimination and retaliation claims. ............................................................................ 2

  A.   State's failure to promote Qashu, restriction of her responsibilities, and nonrenewal of her fellowship are actionable. ................................................................................... 2

  B.   A jury could conclude that State discriminated against Qashu because of her disability. ..................................................................... 5

    1.   A jury could find that State's explanations for Qashu's fellowship nonrenewal are pretextual. ........................................ 5

    2.   A jury could believe that State's explanation for denying Qashu leadership of the ocean-acidification portfolio is pretextual. ................................................................................ 11

    3.   State did not attempt to explain why it restricted Qashu's responsibilities to assisting a less-qualified employee. .............. 13

  C.   A jury could find that State retaliated against Qashu. ...................... 14

II.  State failed to accommodate Qashu. ................................................. 15

  A.   The accommodations Qashu requested were reasonable. ................ 15

  B.   A jury could find that State failed to provide Qashu with reasonable accommodations after she started her job and encountered problems with equipment. ........................................... 18

  C.   Qashu's success does not preclude a finding that State failed to accommodate her. .................................................................... 26

Conclusion. ......................................................................................... 26

Certificate of Compliance ......................................................................

Certificate of Service .............................................................................

# Table of Authorities

**Cases**                                                                                          **Page(s)**

*Aka v. Washington Hosp. Ctr.,*
  156 F.3d 1284 (D.C. Cir. 1998)..................................................................8, 12

*Ali v. Regan,*
  111 F.4th 1264 (D.C. Cir. 2024) ...............................................................15, 19

*Bahlul v. United States,*
  77 F.4th 918 (D.C. Cir. 2023) .........................................................................3

*Brown v. Howard Univ. Hosp.,*
  172 F. Supp. 3d 187 (D.D.C. 2016)................................................................7

*Carter v. George Washington Univ.,*
  387 F.3d 872 (D.C. Cir. 2004)........................................................................5

*Chambers v. District of Columbia,*
  35 F.4th 870 (D.C. Cir. 2022) (en banc).....................................................3, 4

*Crane v. Lifemark Hosps., Inc.,*
  898 F.3d 1130 (11th Cir. 2018)......................................................................15

*Czekalski v. Peters,*
  475 F.3d 360 (D.C. Cir. 2007).........................................................................9

*Deane v. Pocono Med. Ctr.,*
  142 F.3d 138 (3d Cir. 1998) (en banc)...........................................................19

*DeJesus v. WP Co.,*
  841 F.3d 527 (D.C. Cir. 2016).........................................................................6

*Dillard v. City of Austin,*
  837 F.3d 557 (5th Cir. 2016)....................................................................19, 21

*EEOC v. Sears, Roebuck & Co.,*
  417 F.3d 789 (7th Cir. 2005)..........................................................................18

*Evans v. Sebelius,*
  716 F.3d 617 (D.C. Cir. 2013)..................................................................10

*Geleta v. Gray,*
  645 F.3d 408 (D.C. Cir. 2011)....................................................................7

*George v. Leavitt,*
  407 F.3d 405 (D.C. Cir. 2005)..................................................................14

*Hamilton v. Geithner,*
  666 F.3d 1344 (D.C. Cir. 2012).......................................................11, 12, 13, 14

*Holcomb v. Powell,*
  433 F.3d 889 (D.C. Cir. 2006)..................................................................12

*Humphrey v. Mem'l Hosps. Ass'n,*
  239 F.3d 1128 (9th Cir. 2001)..................................................................19

*Iyoha v. Architect of the Capitol,*
  927 F.3d 561 (D.C. Cir. 2019)....................................................................9

*Jankowski Lee & Assocs. v. Cisneros,*
  91 F.3d 891 (7th Cir. 1996)......................................................................15

*Mason v. Wyeth, Inc.*
  183 F. App'x. 353 (4th Cir. 2006) ............................................................10

*Muldrow v. City of St. Louis,*
  601 U.S. 346 (2024).........................................................................2, 3, 4

*Oviedo v. Washington Metro. Area Transit Auth.,*
  948 F.3d 386 (D.C. Cir. 2020)....................................................................9

*Reeves v. Sanderson Plumbing Prods.,*
  530 U.S. 133 (2000)..............................................................................12

*Rehling v. City of Chicago,*
  207 F.3d 1009 (7th Cir. 2000)..................................................................19

*Said v. Nat'l R.R. Passenger Corp.,*
317 F. Supp. 3d 304 (D.D.C. 2018)......................................................................9

*Taylor v. Phoenixville Sch. Dist.,*
184 F.3d 296 (3d Cir. 1999).................................................................................25

*U.S. EEOC v. UPS Supply Chain Sols.,*
620 F.3d 1103 (9th Cir. 2010).............................................................................17

*Van Horn v. Del Toro,*
2024 WL 4381186 (D.C. Cir. Oct. 3, 2024) ........................................................3

*Ward v. McDonald,*
762 F.3d 24 (D.C. Cir. 2014)..............................................................................18

## Statutes and Regulations

42 U.S.C. § 12112(a) ..........................................................................................17

29 C.F.R. § 1630.2(n)(1) ....................................................................................16

29 C.F.R. § 1630.2(n)(3) ....................................................................................16

29 C.F.R. § 1630.2(o)(1)(ii) ...........................................................................15, 16

29 C.F.R. § 1630.2(o)(1)(iii) ..........................................................................15, 17

# Glossary

| | |
|---|---|
| American Association for the Advancement of Science | AAAS |
| Americans with Disabilities Act | ADA |
| Equal Employment Opportunity | EEO |
| Equal Employment Opportunity Commission | EEOC |
| Job Access With Speech | JAWS |
| United States Department of State | State |

## Introduction and Summary of Argument

Throughout Dr. Susan Qashu's fellowship, the Department of State disparaged her credentials as a scientist, ridiculed her, and disregarded her need for accommodations, all based on her disability. When a leadership role opened on Qashu's team, State not only passed her over for E. Boeck, a recent college graduate with no relevant experience, but it also eliminated her substantive duties and relegated her to a clerical role. It then rescinded her fellowship-renewal offer without warning, falsely claiming that Qashu declined the offer despite her attempts to accept it.

State discriminated and retaliated against Qashu when it took three adverse-employment actions: promoting Boeck over Qashu, restricting Qashu's responsibilities, and deciding not to renew Qashu's fellowship. Each of these is separately actionable. State argues that promoting Boeck over Qashu and restricting Qashu's responsibilities are not actionable because these actions did not harm Qashu with respect to the terms and conditions of her employment. But State ignores evidence showing that its staffing decisions took away her substantive responsibilities. State also argues that it took all three actions for nondiscriminatory and nonretaliatory reasons. State again ignores contrary evidence—including its shifting and false explanations and decisionmakers' discriminatory conduct—that would allow a jury to find that State's proffered explanations were pretext for discrimination and retaliation.

State also failed to accommodate Qashu. State argues that it cannot be held liable because it provided her with accommodations when she started her fellowship. But the Rehabilitation Act's accommodation obligation doesn't end there. Qashu requested further accommodations after starting because State's initial accommodations were failing. Instead of working with Qashu to resolve the problems that led to delays in her work and criticism from colleagues, Qashu's supervisors refused to engage with her. As a result, a jury could find that State denied or delayed the accommodations she requested in violation of the Rehabilitation Act.

### Argument

**I.    Qashu established disparate-treatment disability-discrimination and retaliation claims.**

**A.    State's failure to promote Qashu, restriction of her responsibilities, and nonrenewal of her fellowship are actionable.**

The parties agree that an employee alleging discrimination need show only that she suffered "some harm" concerning a "term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 350, 354-55 (2024); *see* State Br. 48; Opening Br. 26-27. Qashu has shown that State took three discrete actionable adverse employment actions against her when it (1) did not renew her fellowship, (2) promoted Boeck over her, and (3) restricted her ocean-acidification responsibilities. Opening Br. 22-27. State does not dispute that the nonrenewal imposed "some harm." State Br. 56. But it asserts that the promotion and restriction of her duties—which it treats as a

2

single "staffing" decision—imposed no harm on Qashu. State Br. 47-50. State is wrong on both scores.

**Promoting Boeck over Qashu.** We have shown that Qashu suffered harm from not being promoted to lead the ocean-acidification portfolio, because failure to promote is the functional equivalent of failure to hire. Opening Br. 25 (citing *Chambers v. District of Columbia*, 35 F.4th 870, 875 (D.C. Cir. 2022) (en banc)).

**Restricting Qashu's job responsibilities on the ocean-acidification portfolio.** State argues that Qashu has not shown "some harm" because she has not explained in detail how her ocean-acidification-related responsibilities changed after Boeck replaced Salmeron. State Br. 49. But Qashu need show only that she suffered "some 'disadvantageous' change in an employment term or condition." *Muldrow*, 601 U.S. at 354. Under *Muldrow*, an employment change that results in an employee no longer doing "meaningful work" can constitute "cognizable harm." *Van Horn v. Del Toro*, 2024 WL 4381186, at *2 (D.C. Cir. Oct. 3, 2024); *see Chambers*, 35 F.4th at 874-75.[1]

---

[1] Contrary to State's argument, State Br. 48-49, *Muldrow* did not displace this Court's decision in *Chambers*. State cites Justice Kavanaugh's *Muldrow* concurrence, State Br. 48-49, but a concurrence cannot overrule binding circuit precedent. *See Bahlul v. United States*, 77 F.4th 918, 925-26 (D.C. Cir. 2023) (noting that circuit precedent remains good law unless clearly overruled by the Supreme Court). Besides, Justice Kavanaugh's concurrence maintained that anyone who experienced a discriminatory job change "should easily be able to show some additional harm," so that the *Muldrow*

As Qashu has shown, that is exactly what happened with her ocean-acidification duties. We previously identified Qashu's numerous substantive responsibilities on the ocean-acidification portfolio when Salmeron was the lead, such as selecting and evaluating ocean-acidification projects, providing technical expertise, and developing an ocean-acidification toolkit. Opening Br. 14-17, 25-26; JA 258-59, 524. State responds that Qashu's duties did not change because she was not the point of contact under Salmeron. State Br. 49-50. Regardless of whether that is true, Qashu's duties did change. When Boeck became lead, Qashu was relegated to providing only clerical support to Boeck. Opening Br. 16-17, 24-25. Qashu was no longer allowed to speak about ocean acidification at staff and interagency meetings without Boeck's permission or to collaborate with the Ocean Acidification Interagency Working Group, and Boeck took Qashu's place at the Governor's conference in San Diego. JA 256-59, 291.

State simply ignores this evidence and focuses only on Qashu's disappointment at no longer being allowed to attend the Governor's conference to conclude that she did not suffer "any harm." State Br. 49. State

---

and *Chambers* approaches "lead to the same result in 99 out of 100 discriminatory-transfer cases, if not in all 100." *Muldrow*, 601 U.S. at 365 (Kavanaugh, J., concurring). In any event, State's argument does not make a difference here because Qashu has shown "some harm" under *Muldrow*, regardless of the status of *Chambers*.

also points to evidence that Qashu continued to assist Boeck on ocean-acidification work until the end of her fellowship. State Br. 50.[2] But a jury could find that Qashu suffered some harm from the drastic change in her ocean-acidification-related duties.

### B. A jury could conclude that State discriminated against Qashu because of her disability.

#### 1. A jury could find that State's explanations for Qashu's fellowship nonrenewal are pretextual.

When State rescinded Qashu's renewal offer, it gave Qashu several different explanations at different times: late or incomplete paperwork, JA 231, 454-55; denial of Qashu's requests to change supervisors or offices, JA 231; lack of "fit," JA 231; Qashu's requests for "too much and too early on," JA 67-68; and purported complaints about Qashu from another office, JA 69. *See* Opening Br. 29-31. State now asserts that the only reason for Qashu's nonrenewal was that she asked to change offices or supervisors instead of returning her renewal paperwork. State Br. 56-57. A jury could find all these justifications pretextual.

**False explanations.** State insists that it "honestly believe[d]" that Qashu initially declined the renewal offer. State Br. 60. But a jury could find both

---

[2] To support this proposition, State cites an email that is not in the record. State Br. 50 (citing "Email from Qashu (Jan. 12, 2017)"). This Court may not consider "evidence that a party never presented to the district court." *Carter v. George Washington Univ.*, 387 F.3d 872, 877 (D.C. Cir. 2004).

that State's explanation is demonstrably false and that State never honestly believed it.

Qashu indicated her intent to accept the offer shortly after receiving it by attempting to submit her signed paperwork with minor corrections to the term dates and to Sohier's designation as her mentor. Opening Br. 32 (citing JA 226-28). The evidence State cites makes the point for us: When Qashu attempted to submit her paperwork, AAAS representatives gave her an indefinite extension on submitting the paperwork and told her they would "work on" her requested changes. JA 62; *see* State Br. 60 (citing JA 61-63). State faults Qashu for refusing to return signed paperwork because of requested changes, but it was actually State that refused to accept that paperwork while it worked out those changes. JA 61-63.

Other evidence illustrates the falsity of State's current explanation for nonrenewal. For instance, State's unperturbed reaction to Qashu's late paperwork and requests for an office or supervisor change—illustrated by its failure to raise any concerns with Qashu prior to rescinding the renewal offer—belies its current reliance on this explanation. Opening Br. 32 (citing *DeJesus v. WP Co.*, 841 F.3d 527, 534 (D.C. Cir. 2016)). Further, if the explanation State now gives was truly a reason for nonrenewal, one would expect State's 30(b)(6) deponent to know about it. But the deponent testified that she did not know if paperwork problems or Qashu's requests to change offices or supervisors were part of the nonrenewal determination, which could lead a jury to doubt that this was State's true justification. JA 346-47.

6

**Shifting explanations.** In the days following its recission of the fellowship renewal offer, State gave Qashu a series of different explanations for nonrenewal, from which a jury could infer pretext. *See* Opening Br. 29-31 (citing *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)). Initially, State blamed the purportedly late paperwork, a mismatch of Qashu's skills and interests with the needs of the office (or a lack of "fit"), and its denial of her requests to change supervisors or offices. JA 231. In subsequent meetings with Qashu, State identified two more reasons, which it now has completely abandoned: Qashu's requests for "too much and too early on," JA 67-68, and purported complaints about Qashu from another office, JA 69.

State now argues that its explanation about the mismatch of skills and interests, or Qashu's "fit" with the office, is not inconsistent with its current justification because "fit" was really about Qashu's request to change offices. State Br. 56-57. But State employee Genya Dana sent an email explaining that the fellowship was not a "good fit" because of concerns about Qashu's portfolio changing, lack of travel, and "difficulties integrating into State Department culture"—not because Qashu requested to change offices or supervisors. JA 378-79. This recharacterization of State's previous explanation is a shift in reasoning over the course of litigation from which a jury could infer pretext. *See Brown v. Howard Univ. Hosp.*, 172 F. Supp. 3d 187, 195-96 (D.D.C. 2016) (citing *Geleta*, 645 F.3d at 413-14).

**Subjective criteria.** We've shown that State's discussion of Qashu's "fit" for the fellowship was a subjective explanation that a jury could view as

7

pretextual. Opening Br. 33-34. State does not engage with whether its "fit" explanation is subjective but instead argues that the "specific language" discussing Qashu's supposed lack of fit with the office in the nonrenewal letter is solely attributable to AAAS. State Br. 61-62. Even if that were true (which we dispute), State's own email explaining the nonrenewal discusses Qashu's "fit" with the office and "difficulties integrating into State Department culture." JA 378-79. "[A]n employer's heavy use of highly subjective criteria, such as interpersonal skills"—or fit with office culture—"could support an inference of discrimination." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (cleaned up).

**Discriminatory conduct.** Discriminatory conduct, even when not directly connected to the adverse decision, can be further evidence of discrimination. *Aka*, 156 F.3d at 1289. We have established that Sohier and Bloom engaged in a pattern of abhorrent conduct that demeaned Qashu because of her disability. Opening Br. 35-36. State does not dispute that this conduct happened and instead disputes only whether Sohier and Bloom were involved in the nonrenewal decision and whether their statements and actions were connected to Qashu's disability. State Br. 62-64.

State's assertion that Sohier and Bloom did not have a hand in Qashu's nonrenewal could easily be rejected by a jury. Sohier himself stated that AAAS called to ask him for his views on rescinding Qashu's renewal offer, and he checked in with Bloom about it. JA 237. Bloom and Sohier need not have been final decisionmakers, because a jury could still infer from their

involvement that the nonrenewal decision was influenced by their discriminatory animus. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 567-69 (D.C. Cir. 2019).

State also implies that Sohier's and Bloom's one-time support for renewing Qashu's fellowship means that this Court should disregard evidence of their discriminatory behavior. State Br. 61. But a discriminator's previous favorable actions toward the plaintiff "cannot immunize him from liability for subsequent discrimination." *Czekalski v. Peters*, 475 F.3d 360, 369 (D.C. Cir. 2007). That point is especially salient here, where Sohier's testimony suggests that his and Bloom's desire to renew her fellowship stemmed not from respect for Qashu or her work, but because they viewed Qashu as "essentially free labor" for the office. JA 237.

Finally, State says that Sohier's and Bloom's disparaging conduct has no "obvious connection to Qashu's disability." State Br. 63. But an "obvious" connection between discriminatory behavior and protected status is not required, and the case State relies on says nothing of the sort. *Oviedo v. Washington Metropolitan Area Transit Authority* disregarded a single discriminatory statement, not because it was unconnected to the plaintiff's protected status but because it lacked evidentiary support. 948 F.3d 386, 394-95 (D.C. Cir. 2020).

Here, drawing all inferences in Qashu's favor, a jury could conclude that Sohier's and Bloom's actions were based on Qashu's disability. *Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 321-22 (D.D.C. 2018). For example,

Sohier yelled at Qashu and employees from State's disability-accommodations office while they were setting up accessibility software, which one such employee found so disturbing that she filed a complaint. JA 255-56. Sohier's pelvic thrusts and Bloom's insistence on turning away from Qashu when she came into his office were demeaning physical gestures that Qashu understood were intended to exploit her limited eyesight. JA 260-61; Opening Br. 36. Behaviors that exploit an individual's disability in this manner are "both cruel-hearted and discriminatory." *Mason v. Wyeth, Inc.* 183 F. App'x. 353, 365 (4th Cir. 2006) (Michael, J., dissenting in part).

**Unwillingness to identify a decisionmaker.** State has never consistently identified the people responsible for the nonrenewal, and this, too, is probative of pretext. Opening Br. 34-35. Even now, State can't make up its mind. It first insists that Qashu herself was the primary decisionmaker because she allegedly rejected her renewal offer, State Br. 59, then says that AAAS was the primary decisionmaker, State Br. 61, and finally asserts that the nonrenewal was a mutual decision by AAAS and State, State Br. 62. State's continued unwillingness to identify a decisionmaker indicates pretext, particularly because two likely decisionmakers (Sohier and Bloom) have been shown to harbor discriminatory animus toward Qashu. *Evans v. Sebelius*, 716 F.3d 617, 622 (D.C. Cir. 2013).

### 2. A jury could believe that State's explanation for denying Qashu leadership of the ocean-acidification portfolio is pretextual.

Our opening brief shows (at 36-40) that a jury could infer that State promoted Boeck over Qashu for discriminatory reasons because (1) Qashu was vastly more qualified than Boeck and (2) State's proffered justification—that Qashu did not volunteer for the role—is pretextual.

State advances two arguments why the massive qualification gap between Qashu and Boeck doesn't matter. State Br. 52-53. State first claims that making Boeck the lead for the ocean-acidification portfolio was not a "decision to promote one employee over another," State Br. 52 (quoting *Hamilton v. Geithner*, 666 F.3d 1344, 1351-52 (D.C. Cir. 2012)), because Boeck was hired "to a position responsible for performing [this] type of work," State Br. 52.  But State has not shown that it hired Boeck to occupy a lead position on a portfolio or that it knew of or anticipated Salmeron's departure when it hired Boeck. JA 203, 285. A jury could find that elevating Boeck to a lead role with expanded responsibility, visibility, and opportunity for career growth was a decision to promote one employee over another.

State next argues that it did not compare Qashu's and Boeck's qualifications because Salmeron did not expressly recommend Qashu (and Qashu did not volunteer to be lead). State Br. 52. That makes no sense. For obvious reasons, employers generally consider the qualifications of the people they select for leadership roles, regardless of whether those people were recommended for the position. Where, as here, the "qualifications gap

11

[is] great enough to be inherently indicative of discrimination," State's decision to promote Boeck over Qashu without weighing their relative qualifications can "justify an inference of discrimination." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006); *see Aka*, 156 F.3d at 1294.

And regardless of whether the disparity between Qashu's and Boeck's qualifications is pertinent, State's justification that it did not promote Qashu because she did not volunteer for the lead role is "unworthy of credence." Opening Br. 39-40 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000)). State has not explained why Qashu needed to request the lead role to be considered for it. Indeed, volunteering apparently was not a prerequisite for promotion because State has not shown that Boeck volunteered for the position either. Besides, it was reasonable that Qashu did not volunteer, given that Salmeron recommended that Qashu "continue the work" and Voltmer indicated that she supported Qashu's "primary role" on the ocean-acidification portfolio. Opening Br. 36-37 (quoting JA 290-91). A jury could find that this amounted to a recommendation that Qashu take over the portfolio.

State's lack of contemporaneous documentation further undercuts its proffered explanation. Opening Br. 39. State acknowledges that this Court found a lack of contemporaneous documentation suspicious in *Hamilton*, 666 F.3d at 1355-56, but argues this case is distinguishable because (1) Boeck's assignment to the lead role was only a "workaday employment action" and

(2) in *Hamilton*, the only relevant documentation did not reflect the employer's proffered justification. State Br. 53.

These arguments are wrong. First, as already discussed, a jury could find that Boeck's assignment to the portfolio was not a "workaday employment action," State Br. 53, but instead a promotion like the one in *Hamilton* that would have been accompanied by documentation. Second, Qashu's performance plan, prepared just a few months after the promotion, showed that she excelled in ocean-acidification work and did not mention State's proffered justification that she did not volunteer for the promotion. JA 476-78. This could lead a jury to doubt State's explanation for Boeck's promotion. *Hamilton*, 666 F.3d at 1356.

Finally, State again argues that Sohier's and Bloom's discriminatory conduct is not relevant to pretext. State Br. 54-55. We've already explained why this argument fails. *See supra* at 8-10.

### 3. State did not attempt to explain why it restricted Qashu's responsibilities to assisting a less-qualified employee.

As shown above (at 3-5), after State promoted Boeck, it also eliminated Qashu's substantive responsibilities on the ocean-acidification portfolio and relegated her to clerical work. Our opening brief explains (at 27-28) that this restriction is evaluated under only the first step of the *McDonnell Douglas* framework because State has not offered a non-discriminatory reason for its actions. Thus, Qashu need show only that State restricted her responsibilities on the ocean-acidification portfolio under circumstances giving rise to an

inference of discrimination, which she has done. Opening Br. 40-41; *see George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). State's only response is that Qashu has not shown "with any detail" that her ocean-acidification responsibilities were restricted. State Br. 55-56.

But as explained above (at 3-5) and in our opening brief (at 25-27), a jury could find that Voltmer restricted Qashu's responsibilities on the ocean-acidification portfolio after Boeck became lead. Qashu has therefore established a prima facie case, and because State has not offered any justification, this claim must also be revived.

### C.    A jury could find that State retaliated against Qashu.

State makes many of the same arguments about whether its adverse actions were actionable or motivated by nondiscriminatory reasons with respect to Qashu's retaliation claims. State's only retaliation-specific argument is that Voltmer didn't know about Qashu's EEO complaint when she restricted Qashu's ocean-acidification duties. State Br. 51. That's wrong. Voltmer knew about Qashu's EEO complaint by September 2016, at the latest, because Qashu told Voltmer she needed time off to attend alternative dispute resolution for her EEO case. JA 285. That Voltmer restricted Qashu's duties less than two months after she learned about Qashu's complaint supports an inference of retaliatory intent. JA 291; s*ee Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012). State provided other reasons for promoting Boeck over Qashu, but we have shown that a jury could find that

14

those reasons were pretextual. *See supra* at 11-13; Opening Br. 36-41. So, Qashu's retaliation claims must go to a jury.

## II.    State failed to accommodate Qashu.

State does not dispute that Qashu was a qualified individual with a disability and that it knew of Qashu's disability. State Br. 25. State disputes only one element of Qashu's reasonable-accommodation claim: whether it denied Qashu's requests for reasonable accommodations. State Br. 25. Genuine disputes of material fact remain on that question, so summary judgment was inappropriate.

### A.    The accommodations Qashu requested were reasonable.

State argues that it did not violate the Rehabilitation Act because the accommodations Qashu requested did not relate to her "fundamental job duties" and therefore were not reasonable. State Br. 31-32. But the requested accommodations were reasonable because they related both to the essential functions of her position and to the benefits and privileges of her employment. *See* 29 C.F.R. § 1630.2(o)(1)(ii)-(iii). And whether an accommodation is reasonable "is often a fact-intensive question 'determined by a close examination of the particular circumstances.'" *Ali v. Regan*, 111 F.4th 1264, 1269 (D.C. Cir. 2024) (quoting *Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir. 1996)). Thus, the question is particularly inappropriate for resolution at summary judgment. *See Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018).

15

**Essential functions.** Reasonable accommodations include "[m]odifications or adjustments to the work environment … that enable an individual with a disability … to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1).

State argues that written job descriptions and the employer's judgment dictate the essential functions of a position, State Br. 31-32, but other kinds of evidence can be used to identify essential job functions, *see* 29 C.F.R. § 1630.2(n)(3). "Evidence of whether a particular function is essential includes" "[t]he amount of time spent on the job performing the function" and "[t]he work experience of past incumbents in the job." *Id.* § 1630.2(n)(3)(iii), (vi).

In its written description of Qashu's position, State included "work[ing] with Bureau, Department, and interagency colleagues, as well as private and non-governmental partners, to promote U.S. policy and ocean conservation." JA 519. That collaboration took place over email and in meetings at State. *See* JA 366, 539. Further, Qashu's supervisors required her to monitor email chains, meet with others inside and outside of the Department, track and review marine scientific research requests, and take several online training courses. *See* JA 200, 309. Much of her time was spent reviewing and drafting "documents, spreadsheets, and maps" and conducting "research via [her] computer." JA 271-72; *see* JA 289, 539-48. And

16

as Sohier acknowledged, Qashu would "need to use" shared office equipment—including the printer, copier, shredder, scanner, and fax machine—"for her fellowship work." JA 373. She needed to print out and scan permits for her work with marine vessel permitting. JA 289. And she needed to fax messages "to embassies, as well as [State's] partners on projects." JA 255; *see* JA 289.

Without accommodations, Qashu struggled to draft and review documents and emails, attend meetings, use shared office equipment, and complete mandatory trainings. Opening Br. 7-8, 44. These tasks were part and parcel of Qashu's key daily work duties, *see* State Br. 29-31, so a jury could find they were essential functions of her position.

**Benefits and privileges.** Reasonable accommodations also include "[m]odifications or adjustments that enable" the employee "to enjoy equal benefits and privileges of employment as are enjoyed by [the employer's] other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii). Qashu requested accommodations so that she could complete job training, *see* JA 463, which is a privilege of employment. "The ADA prohibits employers from discriminating against individuals 'in regard to … job training.'" *U.S. EEOC v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1113 (9th Cir. 2010) (quoting 42 U.S.C. § 12112(a)). Without accommodations, Qashu "could not complete the [mandatory training] courses independently like her peers who did not have disabilities." JA 309. Thus, accommodations

that would have enabled her to complete training courses are "reasonable accommodations."

*   *   *

State faults us for not tying each of Qashu's requested accommodations to an essential function. State Br. 32. But each accommodation obviously would have enabled her to perform the essential functions of her position or allowed her to enjoy the benefits and privileges of employment. A functional computer and assistive technology, along with a quieter office in which to hear that technology, would have enabled Qashu to complete her work, which was often on the computer. Readers would have enabled her to complete tasks and mandatory trainings that were not compatible with her assistive software. Accessible shared office equipment and meeting notifications would have enabled Qashu to communicate with embassies and meet with others both inside and outside State.

> **B.**     **A jury could find that State failed to provide Qashu with reasonable accommodations after she started her job and encountered problems with equipment.**

Employers and employees must use an "interactive process" to "determine what accommodation would enable [an] employee to continue working." *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). Thus, if an employer "ended the interactive process or … participated in the process in bad faith," the employer "denied" the employee's request for accommodation. *Id.*

18

True, the interactive process "is not an end in itself." State Br. 27 (quoting *Ali v. Regan*, 111 F.4th 1264, 1274 (D.C. Cir. 2024)). But State cannot dispute that the process is critical because it is "a means to the end of 'determining what reasonable accommodations are available.'" *Ali*, 111 F.4th at 1274 (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)). Thus, "an employer who fails to engage in the interactive process runs a serious risk that it will erroneously overlook an opportunity to accommodate a statutorily disabled employee, and thereby violate" the Rehabilitation Act. *Id.* at 1270 (quoting *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 149 (3d Cir. 1998) (en banc)).

The interactive process is especially crucial when an initial reasonable accommodation turns out to be ineffective. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001). That is what happened here, so the fact that State communicated with Qashu and provided accommodations on her start date is not dispositive. *See* State Br. 28-29. The interactive process "should be an ongoing, reciprocal process, not one that ends with 'the first attempt at accommodation,' but one that 'continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed.'" *Dillard v. City of Austin*, 837 F.3d 557, 562 (5th Cir. 2016) (quoting *Humphrey*, 239 F.3d at 1138). What matters is that State ended the interactive process or engaged in it in bad faith once Qashu's initial accommodations failed.

19

A jury could find that State denied Qashu reasonable accommodations, or improperly delayed providing them, because it stopped engaging in the interactive process. State's arguments to the contrary are unavailing. We first address an accommodation that State does not dispute it could have provided.

**Quieter office.** Qashu repeatedly requested a quieter office so that she could hear her assistive technology. JA 288. Yet, State did not move her into a quieter office until seven months after her first request. JA 266-67, 274.

State fails to explain why it denied Qashu's request for a quieter office for so long or why it then decided to grant her request seven months into her twelve-month fellowship. Opening Br. 51. Nor does State argue that it engaged with Qashu to find alternatives to her requested accommodation—because it did not. And State never explains why Qashu could not have been moved into one of the four empty offices available when she first requested a quieter office. Opening Br. 50.

State instead takes issue with "a quiet environment [being] a necessary accommodation." State Br. 43. But Qashu's first office was near "the noisy[] printer, scanner and cable room," JA 267; *see* JA 536, and the noise from the equipment and people socializing was too loud, JA 267, 487. A quieter office was therefore necessary so Qashu could hear her JAWS software when her computer was working. JA 267, 487.

State also argues that a quieter office was not a necessary accommodation because Qashu had been provided with noise-cancelling headphones. *See*

20

State Br. 43-44. First, the headphones would not have helped Qashu hear any readers who assisted her in-person. Second, the headphones were provided to Qashu on her start date. JA 189. A jury could determine that because she complained about the noise after that date, State should have known that the headphones were ineffective and that she needed an alternative accommodation. *See Dillard*, 837 F.3d at 562.

**Functioning computer, Zoomtext, and JAWS.** Qashu's computer regularly froze and crashed for the first nine months of her twelve-month fellowship, often as frequently as five times a day. Opening Br. 7, 45. When State installed Zoomtext and JAWS on Qashu's standard-issue computer, it did not test the computer to ensure that it could run Zoomtext and JAWS effectively. JA 308, 330-31. State argues that "the cause of [Qashu's] desktop issues was never determined" and that those problems might have been caused by something unrelated to her assistive software. State Br. 33. State thus implicitly concedes that the computer problems existed, leaving a question of disputed fact as to whether the problems were caused by incompatibility with her assistive technology.

State also argues that "other Department employees with vision loss used assistive software on their standard-issue desktops without a problem." State Br. 33 (citing deposition of State assistive-technology coordinator Richard McCarthy). But McCarthy's deposition speaks only to the experience of "other JAWS users"—not users of both Zoomtext *and* JAWS. JA 167. And State required Qashu to use software for her research that did

not work with her assistive technology. JA 309. No evidence shows that other JAWS users were running the assistive technology alongside the research software Qashu needed.

State eventually replaced Qashu's desktop, but the new desktop had similar problems with "instability, freezing, and black-outs." JA 272. And in October 2016, Qashu alerted State that her desktop fan was making a loud grinding noise. JA 465. State claims the issues "were remedied [the] same day" Qashu "return[ed] to the office on November 14," State Br. 35, but the record indicates otherwise. State was "supposed to have fixed the grinding" by the time Qashu left the office on November 4, but when Qashu returned on November 16, the computer had no login screen and was malfunctioning. JA 465. And even after State swapped out the computer fan, Qashu's assistive software could not run a computer-based mandatory training course. JA 463.

State posits that Qashu could have used her laptop instead of her desktop when the desktop was malfunctioning. State Br. 35. State never raised this argument in the district court, and that is unsurprising. No record evidence suggests the laptop could have served as a substitute for Qashu's desktop. In fact, State issued the laptop to Qashu specifically for travel and required that she use the desktop computer when in the office. JA 323, 495.

State acknowledges that these computer problems rendered the experience with Zoomtext and JAWS "sometimes less-than-'perfect.'" State Br. 35. But these accommodations were not just less-than-perfect. They did

not allow Qashu to use her computer for the essential job functions of sending emails, conducting research, and reviewing documents. These problems "resulted in delays in [Qashu's] work product" and in criticism from colleagues, who commented that tasks were taking her too long. JA 272.

Despite colleagues' criticism of Qashu, JA 272, Bloom, Sohier, and Voltmer refused to help, JA 254-55, 267. And Qashu received criticism and hostility from her supervisors when they noticed a disability-accommodations office employee assisting her. JA 255, 300. State counters that Voltmer asked whether Qashu required any additional support in September 2016, State Br. 37, but Voltmer asked the question only to get out of a meeting between Voltmer, Qashu, and the disability-accommodations office, *see* JA 195. Qashu wanted Voltmer to meet with that office because Voltmer did not understand Qashu's needs or why her computer kept failing, but Voltmer did "not want to hear about any computer issues." JA 487. A reasonable jury could find that State failed to provide Qashu with a computer that effectively ran her assistive software and that Qashu's supervisors refused to engage with her to find reasonable accommodations that would resolve the problem.

**Readers.** Even when Qashu's computer worked, Zoomtext and JAWS could not always read out the information on Qashu's screen. Qashu thus requested readers when the assistive technology would not help her, but she struggled to obtain timely reader assistance. Opening Br. 49. State argues that "Qashu does not explain why she could not take the simple action of

23

providing advance notice when she anticipated the need for a reader." State Br. 40. But Qashu needed a reader when her assistive technology would not work—something she could not predict in advance. *See* JA 465-66.

State then argues that Qashu did not "identify a single occasion when a reader was not available to timely meet one of her needs." State Br. 41. That's not true. Our opening brief (at 49) cites an email in which Qashu told State that she had been "asking for the reader assistance for a while." JA 486. State points to emails where "McCarthy promptly connected" Qashu "to a reader for scheduling." State Br. 42. But these emails do not show whether a reader was ever actually scheduled to help Qashu that day. *See* JA 463-65. A jury could determine that State could not always fulfill Qashu's requests for a reader because it "did not have on call readers" and requests for readers "could take weeks." JA 260; *see* JA 335; Opening Br. 49.

**Shared office equipment.** Qashu could not operate shared office machines with low-contrast interfaces or gray-on-gray, green-on-darker green, or gray-on-green screens. JA 273. Qashu needed to scan documents to read them, but State refused to provide accommodations that would have enabled her to use the scanner. JA 267. And Sohier "refused to talk to any employees, including [Disability and Reasonable Accommodations Division] employees, about [Qashu's] computer and printer hookup." JA 255. Sohier acknowledged the lack of accommodation, testifying that nothing was "done to make [shared] office equipment accessible" to Qashu. JA 373.

24

State argues that Qashu could have used her Ruby handheld magnifier to "overcome any difficulty posed by the low contrast on the digital displays of the shared office equipment," State Br. 40, but even with her magnifier, all she could see was "pixelated blurriness," JA 273. And although the "Ruby can do color filtration," State did not perform an assessment to ensure that the model it provided to Qashu would work on the shared office equipment's interfaces. JA 169.

**Meeting notifications.** Contrary to State's assertion, Qashu sought but never received assistance attending meetings. JA 289; Opening Br. 47. And her supervisors knew she could not log into her computer to access her emails and noticed that she missed meetings, JA 361-62, 367, 369-70, but they came up with no other method for telling Qashu about meetings, *see* JA 364-65. Indeed, Sohier refused even to acknowledge that Qashu's disability could impact her ability to attend meetings. JA 369. A jury could find that State was aware of Qashu's meeting-notification problems and did not engage with her to consider possible accommodations. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313-18 (3d Cir. 1999); Opening Br. 48.

State argues that "staff meetings took place at the same time and location each week," so Qashu could have ensured attendance "by monitoring the time." State Br. 38. But Qashu had to attend meetings other than weekly staff meetings, JA 365-66, which were not always in the same place or at the same time, *see* JA 365.

25

### C. Qashu's success does not preclude a finding that State failed to accommodate her.

State argues that the accommodations it provided to Qashu at the beginning of her fellowship enabled her to perform her fundamental job duties successfully. State Br. 30-31. True, Qashu did an excellent job. But an employee's success does not reveal the whole picture: The employee may have overcome significant hurdles attributable to a lack of accommodations, which a person who does not need accommodations would not have had to endure.

And that's just what happened here. Qashu had to stay late at work to make up for the hours lost battling her malfunctioning computer. JA 266-67. She took too long to complete tasks and received criticism from her supervisors and colleagues because of it. JA 272. If she had been reasonably accommodated, as the law demands, none of that would have happened.

All told, a jury could determine that State's failure to accommodate Qashu is just another variation on its disdain for Qashu because of her disability, the same disparate treatment that resulted in the nonrenewal of her fellowship, the promotion of a less-qualified candidate, and the restriction of her substantive responsibilities.

### Conclusion

This Court should reverse and remand for a trial on each of Qashu's claims.

Respectfully submitted,

/s/Regina Wang

| | |
|---|---|
| Madeleine Gates | Regina Wang |
| WASHINGTON LAWYERS | Brian Wolfman |
|   COMMITTEE FOR CIVIL RIGHTS | Becca Steinberg |
|   AND URBAN AFFAIRS | GEORGETOWN LAW APPELLATE |
| 700 14th Street NW Ste 400 |   COURTS IMMERSION CLINIC |
| Washington, DC 20005 | 600 New Jersey Ave., NW, |
| (202) 319-1010 |   Suite 312 |
| | Washington, D.C. 20001 |
| Sara Brizio | (202) 661-6741 |
| Shreya Sarin | |
| Grace Seifert | |
|   Student Counsel | |
| | Counsel for Plaintiff-Appellant |
| | Susan Qashu |

April 15, 2025

27

**Certificate of Compliance**

This document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitations. In compliance with Rule 32(a)(7)(B), it contains 6083 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1), and it has been prepared in proportionally spaced typeface using Palatino Linotype, 14-point, in Microsoft Word 2016.

/s/Regina Wang
Regina Wang
Counsel for Plaintiff-Appellant

## Certificate of Service

I certify that, on April 15, 2025, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system. Eight paper copies of this brief will also be filed with the Clerk of this Court.

<u>/s/Regina Wang</u>
Regina Wang
Counsel for Plaintiff-Appellant